**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (EK-8989)
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: ek@zlk.com

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HENRY CHURCH VI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GLENCORE PLC, IVAN GLASENBERG, and STEVEN KALMIN,<br><br>Defendants. | Case No. 2:18-cv-11477-SDW-CLW<br><br>**Judge Susan D. Wigenton**<br><br>**Magistrate Judge Cathy L. Waldor**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Randall Seymour, and additional plaintiff Michael Shannon, individually and on behalf of all other persons similarly situated (hereinafter "Plaintiffs"), by their undersigned attorneys, alleges in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the

following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of Glencore plc's ("Glencore") public documents, conference calls and press releases; (b) review and analysis of securities analysts' reports, articles, and advisories concerning Glencore; (c) review and analysis of complaints and other documents relating to the investigations against Glencore; and (d) information readily obtainable on the Internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a class action complaint seeking damages from Defendants for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of persons or entities who had domestic transactions in publicly traded Glencore securities from September 30, 2016 through December 5, 2019, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' fraudulent conduct as detailed herein.

2. Throughout the Class Period, Defendants knowingly made materially false and misleading statements or omissions about Glencore's commitment to the highest ethical standards, assuring investors that Glencore is "committed to complying with or exceeding the laws and external requirements applicable to [its] operations." In reality, Glencore hid from investors that it had engaged in bribery in the Democratic Republic of the Congo (the "DRC"), Venezuela, and Nigeria, and was associated with a known corrupt businessman in the DRC, Dan Gertler ("Gertler"). Glencore's bribery and association with Gertler subjected investors to heightened risks of investigations into Glencore's compliance with money

laundering and bribery laws, as well as the Foreign Corrupt Practices Act ("FCPA"). This risk ultimately came to fruition through investigations by the Ontario Securities Commission ("OSC"), the U.S. Department of Justice ("DOJ"), the Serious Fraud Office ("SFO"), and the U.S. Commodity Futures Trading Commission ("CFTC"). As a result of these misrepresentations, investors were materially harmed.

3. Glencore is a large natural resource company and does substantial business in high risk areas including the DRC, Venezuela, and Nigeria. In order to do business in the DRC, Glencore engaged Dan Gertler, a close friend of DRC President Joseph Kabila. At the request of Glencore, Gertler made a bribes to President Kabila, allowing Glencore to obtain the rights to assets in the DRC. On December 21, 2017, U.S. Government designated Gertler and affiliated companies as Specially Designated Nationals (SDNs), thereby imposing blocking sanctions on them and companies owned 50% or more by them. Despite this, Glencore continues to make royalty payments to Gertler to this day, a move said to be "unprecedented."

4. Similarly, Glencore engages in bribery in Venezuela in order to gain a market advantage in oil contracts. Glencore paid substantial amounts of money to Francisco Morillo ("Morillo") and Leonardo Baquero ("Baquero") through fictitious "advisory" agreements. In return Morillo and Baquero used the money to bribe Venezuelan state-owned energy company Petróles de Venezuela, S.A. ("PDVSA") employees. These employees then gave Glencore advance and confidential information concerning PDVSA's future tenders for its purchases and sales of hydrocarbon products and the bids made by competing oil traders. This resulted in an unfair advantage to Glencore. Glencore also engaged in bribery in Nigeria primarily related to oil offtake agreements, similar to Venezuela.

5. Despite the above bribery schemes, Defendants made materially false and misleading statements telling investors that Glencore was committed to "operat[ing] transparently and responsibly" and that it "seek[s] to maintain a culture

of ethical [behavior] and compliance throughout [Glencore], rather than simply performing the minimum required by laws and regulations." Glencore assured investors that "[r]egarding going into these countries risks, we will assess it carefully. We'll operate in a responsible, lawful and sustainable manner. If we do operate in these countries and -- we'll continue as long as we do it correctly." Similarly, Defendants failed to adequately warn investors that Glencore's involvement in bribery and dealing with Gertler would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

6. Defendants made these statements with actual knowledge of, or were deliberately reckless in not knowing, the true state of affairs at Glencore. These statements were revealed to be materially false and misleading when the OSC, DOJ, SFO, and the CFTC announced investigations into Glencore and its subsidiaries for allegations of bribery and conduct occurring from 2007 to the present in the DRC, Venezuela and Nigeria.

7. Defendants made these statements, and others like them, in an effort to reassure the investing public about Glencore's integrity. Reasonable investors, like Plaintiffs, relied on these statements as reflective of the true state of affairs at Glencore. And, when they purchased Glencore's securities during the Class Period, they did so at artificially inflated prices. When the truth about Defendant's conduct emerged, Glencore's stock price declined as the market discovered the true nature of Glencore. Plaintiffs and other Class members suffered significant damages as their investments dropped in value. Defendants are liable for these losses.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10. Glencore is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below: (i) it engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States; (ii) in committing the fraudulent acts complained of herein, Glencore operated as a unitary business and an integrated enterprise with substantial offices and operations, including those based in the United States, and controlled the internal affairs and operations of the offices to the extent that they became mere instrumentalities of their parent; and (iii) Glencore has had and continues to have continuous and systematic contacts with this forum that render it at home in the United States.

11. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendants' business, actions, and the subsequent damages, took place within this District.

12. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13. Lead Plaintiff Randall Seymour, on behalf of the Randall A. Seymour Rollover IRA, and Randall A. & Robin L. Seymour Trust UA 02/21/2000, purchased

Glencore shares of GLCNF at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. At all times, Plaintiff Seymour had control over the investment decisions, and was duly authorized to act on behalf of the Randall A. Seymour Rollover IRA, and Randall A. & Robin L. Seymour Trust UA 02/21/2000. Plaintiff Seymore is located in the United States, placed his buy order in the United States, and paid the purchase price of the Glencore securities in the United States. Plaintiff Seymour hereby attaches his certification evidencing his transactions with the Court in connection with the Complaint and it is incorporated herein by reference.

14. Additional Plaintiff Michael Shannon, individually, and on behalf of the Roth IRA FBO Michael J. Shannon and the IRA FBO Michael J. Shannon, purchased Glencore shares of GLNCY at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff Shannon is located in the United States, placed his buy order in the United States, and paid the purchase price of the Glencore securities in the United States. Additionally, GLNCY ADR shares were issued by banks with offices located in New York City, within the United States, and records showing the transfer of title to Shannon are located on the transfer books maintained in the United States. Plaintiff Shannon hereby attaches his certification evidencing his transactions with the Court in connection with the Complaint and it is incorporated herein by reference.

15. Defendant Glencore is incorporated in Jersey, United Kingdom, with headquarters in Baar, Switzerland. Glencore has offices, subsidiaries, or operations located throughout the United States and has contacts in the United States such that Glencore could reasonably anticipate being haled into court in the United States. Throughout the Class Period Glencore maintained a substantial presence in the United States, and currently has offices, operations, or subsidiaries located in Alabama, Arizona, California, Connecticut, Delaware, Georgia, Illinois, Kentucky,

Louisiana, Maryland, Michigan, New York, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, and Washington.

16. On an ongoing basis and for each fiscal year, Glencore published on its Internet website English-language versions of its annual and half year reports, earnings and other press releases, investor presentations, governance and business policies, and other information reflecting Glencore's results of operations or financial condition, changes in business, acquisitions or dispositions of assets, changes in management or control, and other information required to maintain compliance with SEC Rule 12g3-2(b), 17 C.F.R. §240.12g3-2(b).

17. Glencore presents its financial statements in U.S. dollars and admits that it provides post-retirement healthcare benefits to certain Glencore employees who are physically located in the United States.

18. Glencore common stock is publicly traded on the London Stock Exchange under the ticker "GLEN". Glencore's shares traded in the United States in the United States OTC Market based in New York under the ticker symbols "GLNCY" and "GLCNF".

19. Glencore common stock is packaged and sold on the OTC Market in the United States under the ticker symbol "GLNCY." GLNCY is an American Depositary Receipt ("ADR") reflecting ownership of shares of GLEN common stock that have been deposited with or are otherwise controlled by a depositary institution in the United States and held for the benefit of the GLNCY purchaser. OTC Markets Group identifies GLNCY as an ADR on its website.

20. Glencore common stock is sold in the United States as a foreign share under the ticker "GLCNF". A foreign share is established in the U.S. when a broker-dealer files with the Financial Industry Regulatory Authority ("FINRA") to create a U.S. ticker symbol in order to facilitate reporting trades in the U.S. in the company's

security. OTC Markets Group, Inc., the operator of the OTC Market, identifies GLCNF as "Ordinary Shares" on its website.

21. Purchasers of GLNCY and GLNCF shares on the OTC Market become irrevocably liable to purchase the shares at the stated price at the time their purchase order is placed.

22. Only shares of common stock that had been issued and authorized by Glencore were available to be sold as ADRs or foreign shares in the United States under the ticker symbols GLNCY and GLNCF.

23. At the start of the Class Period, Glencore had issued more than 14.5 billion ordinary shares. During the Class Period, daily average trading volume in in GLNCY and GLCNF was 264,036 shares/day and 74,070 shares/day respectfully.

24. Defendant Ivan Glasenberg ("Glasenberg") has served as Glencore's Chief Executive Officer ("CEO") throughout the Class Period.

25. Defendant Steven Kalmin ("Kalmin") has served as Glencore's Chief Financial Officer ("CFO") throughout the Class Period.

26. Defendants Glasenberg and Kalmin are collectively referred to herein as the "Individual Defendants."

27. Each of the Individual Defendants:

a. directly participated in the management of Glencore;

b. was directly involved in the day-to-day operations of Glencore at the highest levels;

c. was privy to confidential proprietary information concerning Glencore and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of Glencore's internal controls;

f. was aware of or recklessly disregarded the fact that the materially false and misleading statements were being issued concerning Glencore; and/or

g. approved or ratified these statements in violation of the federal securities laws.

28. Glencore is liable for the acts of the Individual Defendants and its other employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

29. The scienter of the Individual Defendants and other employees and agents of Glencore is similarly imputed to Glencore under respondeat superior and common law agency principles.

30. Glencore and the Individual Defendants are referred to herein, collectively, as the "Defendants."

31. The Individual Defendants, because of their positions with Glencore, possessed the power and authority to control the contents of Glencore's public statements, reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Glencore's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or

misleading. The Individual Defendants are liable for the false statements pleaded herein.

**RELEVANT NON-PARTIES**

32. **Gertler**. Gertler is an international businessman and billionaire who has amassed his fortune through hundreds of millions of dollars' worth of opaque and corrupt mining and oil deals in the DRC. For example, Gertler sold to the DRC government for $150 million the rights to an oil block that Gertler purchased from the government for just $500,000, a loss of $149.5 million in potential revenue. Between 2010 and 2012 alone, the DRC reportedly lost over $1.36 billion in revenues from the underpricing of mining assets that were sold to offshore companies linked to Gertler.

33. Glencore was Gertler's biggest partner, and the two often considered synonymous in the DRC due to their vast business dealings. Between 2007 and 2017, the pair participated in more than a dozen transactions involving Congolese assets that turned Glencore into the world's third-largest copper producer and largest producer of cobalt. Glencore also helped Gertler accumulate more than $2 billion in wealth through their joint investments and transactions in the DRC. Gertler has admitted that he managed his relationship with Glencore directly with Defendant Glasenberg.

34. On December 21, 2017, the U.S. Government designated Gertler and his affiliated companies as SDNs, thereby imposing blocking sanctions on them and companies owned 50% or more by them. Despite this, Glencore continues to make royalty payments to Gertler to this day.

35. **Morillo and Baquero**. Morillo and Baquero formed an energy consultancy firm called Waltrop Consultants, C.A. ("WTRPC") in Venezuela. and an energy advisory and trading firm called Helsinge, Inc. ("Helsinge"), which they

incorporated in Panama. Morillo and Baquero, through WTRPC, Helsinge, and other companies bribed PDVSA employees on behalf of Glencore.

## SUBSTANTIVE ALLEGATIONS

### A. Relevant Company Background.

36. Glencore is a large natural resource companies and a producer and marketer of more than 90 commodities. Glencore also moves millions of tons of commodities across the globe, linking the suppliers of raw materials — often in developing countries — with consumers in wealthy and fast-growing ones.

37. However, Glencore operations are far riskier than its competitors. Glencore often exceeds the limits of what is allowed in the modern global economy. Glencore does so by doing business in some of the poorest and most corrupt countries in the world, including high risk areas like the DRC, Venezuela, and Nigeria.

38. Some of Glencore's most profitable assets are in the DRC. For example, Glencore owns 86% of Canadian company Katanga Mining Ltd ("Katanga Mining"). Katanga Mining is a mining company operating in the DRC with its headquarters in Canada. Katanga Mining operates a major mine complex in the DRC's Katanga Province, producing refined copper and cobalt. It claims to have the "potential of becoming Africa's largest copper producer and the world's largest cobalt producer."

39. Katanga Mining jointly owns the Kamoto Copper Company SARL (KCC) with the DRC state-owned La Générale des Carrières et des Mines ("Gécamines"). Katanga Mining owns 75% while Gécamines owns 25% of KCC. KCC produces copper and cobalt at the Kamoto concentrator, the Luilu metallurgical plant, the Kamoto underground mine and two oxide open pit resources in the Kolwezi district.

40. Glencore also owns Mutanda Mining. The Mutanda Mining operation provides approximately 20% of the world's cobalt supply.

41. Cobalt is considered a critical raw material and technology enabler, where its used in gas turbines, high temperature alloys, industrial catalysts and energy storage. Cobalt is a key ingredient in the battery chemistry that is expected to transition to a low-carbon economy. Cobalt is only found in economically exploitable quantities in just a few countries, including those in Central Africa. Around 49% of the world's reserves are found in the DRC which is also responsible for close to 60% of annual mine supply.

42. Given its broad range of applications, cobalt is expected to experience good demand growth in its traditional markets going forward whilst battery sector demand is likely to rise at double-digit rates, leading to strong and sustained consumption growth.

43. In 2017, copper assets, including cobalt, represented $17,218,000,000 in revenue, approximately 58% of Glencore's total metals and minerals revenue.

44. In 2018, copper assets, including cobalt, represented $18,200,000,000 in revenue, approximately 59% of Glencore's total metals and minerals revenue.

45. Accordingly, the mines in the DRC represented an integral part of Glencore's current and future operations due to the high demand of cobalt.

46. Katanga Mining and Mutanda Mining were held in part by Gertler, through his company Fleurette Properties Limited, until Glencore purchased these assets from Fleurette in February 2017.

## B. Glencore Subjected Shareholders to Heightened Risks in the DRC, Venezuela, and Nigeria.

47. Glencore engaged in corrupt practices and illegal payments in the DRC, Venezuela, and Nigeria that subjected Glencore to increased risks of scrutiny by U.S. and foreign government bodies. Throughout the Class Period, Defendants made

material misrepresentations related to the existence of this increased risk. The risk resulted in investigations into Glencore's compliance with money laundering and bribery laws, as well as the Foreign Corrupt Practices Act. While the U.S. Foreign Corrupt Practices Act makes it a crime for companies to bribe overseas officials to win business, this practice was commonly used by Glencore to gain an economic advantage.

1. *The Democratic Republic of the Congo*

a. *Association with Gertler*

48. One of Glencore's riskiest decisions that would lead to billions of dollars in "gifts" and write-downs in order to keep its assets in the DRC was its decision to associate with Dan Gertler in order to do business in the DRC. In order to do business in the DRC, Glencore engaged Gertler, a close friend of DRC President Joseph Kabila. At the request of Glencore, Gertler made a bribes to President Kabila, allowing Glencore to obtain the rights to assets in the DRC.

49. The Paradise Papers, released in November 2017, revealed damning details of Glencore's business deals in the DRC, where confidential board minutes show that Gertler personally negotiated mining licenses in favor of Katanga Mining, that Glencore pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in loans and options as a reward.

50. Shortly after, Glencore announced on November 20, 2017 that Katanga Mining was being investigated by the Ontario Securities Commission ("OSC").

51. In an attempt to distance itself from Gertler, on February 13, 2017, Glencore agreed to a $960 million deal with Gertler to buy out his holdings in Katanga Mining and Mutanda Mining, the two Congolese copper and cobalt mines.

52. As part of the agreement, Glencore agreed to pay Gertler's Fleurette Group $534 million cash after all debts are paid. The assets include a 31% stake in Mutanda Mining, and a 10.3% holding in Katanga Mining. The consideration for the

Mutanda Shares was $922 million, and the Katanga Shares was $38 million (minus debts).

53. According to a Bloomberg article, "[t]he deal allows Glencore to end a relationship that has brought much scrutiny, both for corruption investigations into Gertler and for the close nature in which the two companies developed their business. The deal also allows Glencore to take full ownership of the mines as commodity prices recover from a three-year lull. . . . It also puts some distance between Glencore and Gertler, four months after the company said it was reviewing bribery allegations said to implicate the billionaire."

*b. Loan to Gertler*

54. In late 2008, Katanga Mining was struggling for capital and received a $265 million loan from Glencore in January 2009 that could be turned into stock. Katanga Mining's share price ultimately collapsed, and Glencore converted the loan into equity, amounting to a take-over.

55. Gertler had built up a significant minority stake in Katanga Mining and Glencore's "loan-to-own" arrangement would have heavily diluted his shareholding. However, by this time Gertler, already well known as a controversial figure in the country, and Glencore already had a relationship. Therefore, Glencore issued a loan of $45 million to Gertler in February 2009, which was channeled through Bermuda and the British Virgin Islands (BVI), and enabled him to preserve his shareholding in Katanga Mining, according to Glencore's corporate records. Glencore made no such loan to other Katanga shareholders.

56. This loan ended up the subject of U.S. proceedings. In 2016, U.S. court documents alleged Gertler channeled more than $100 million in bribes to Congolese officials on behalf of New York hedge fund Och-Ziff Capital Management LP, which paid $413 million to settle federal charges. The Och-Ziff settlement documents allege that the New York Hedge fund issued a margin loan on Katanga Mining stock

to Gertler, and that Gertler used some of the margin loan to payback Glencore, and some of the loan to bribe President Kabila. To back this margin loan, Gertler used his shares in Katanga Mining that he owned because of $45 million loan made from Glencore to Gertler.

*c. Royalty Payments Owed to Gertler*

57. Gécamines is allocated a portion of annual sales from KCC. However, in January 2015, Gécamines signed over its royalties from the KCC project to Gertler's Cayman Islands-based company, Africa Horizons Investment Ltd., Glencore and Fleurette, Gertler's privately owned company, have represented.

58. Glencore and Fleurette stated that Gécamines wanted the money shifted to Gertler's company to pay back a $196 million loan Fleurette made to Gécamines in 2013.

59. Accordingly, Glencore was making payments to Gertler, for payments that Gertler had made to the DRC. By 2017 Glencore had made over $100 million in payments to Gertler that were previously owed to the DRC. Gertler is still owed these royalty payments to this day.

60. As a result of Gertler's corrupt deals in the DRC, on December 21, 2017, the U.S. announced a new executive order which "launched a new sanctions regime targeting human rights abusers and corrupt actors around the world." President Trump declared a national emergency with respect to serious human rights abuse and corruption around the world and provided for the imposition of sanctions on actors engaged in these malign activities. In an Annex to the Order, the President imposed sanctions on 13 serious human rights abusers and corrupt actors, including Dan Gertler and companies associated with him.

61. While Glencore pledged to honor the U.S. imposed sanctions, Glencore stated it was still reviewing its contractual obligations. Glasenberg stated on February 22, 2019, "[w]e've got to follow the correct procedures and we'll come to

the right conclusions," said Ivan Glasenberg, the chief executive officer on February 22, 2018.

62. On April 27, 2018, Glencore issued a press release stating Ventora Development Sasu ("Ventora"), a company affiliated with Gertler, served in the DRC freezing orders against Mutanda Mining and KCC, for approximately $695 million and $2.28 billion respectively, which it alleges is the value of the future royalties due to it under the agreement.

63. On June 15, 2018, Glencore also announced that they would continue to make royalty payments to Gertler, despite the U.S. Sanctions, in order to protect its assets in the DRC. Bloomberg reported that "Gertler scored a victory when Glencore said on Friday that it would evade U.S. sanctions to keep paying him royalties from copper and cobalt mines."

64. The market and analysts were shocked. According to Bloomberg, "It's a rare, possibly unprecedented, arrangement for a global corporation and speaks to Gertler's power over Glencore, which has bet its future on Congo's mining riches."

65. Mark Bristow, the chief executive officer of Randgold Resources Ltd., which has a gold exploration project with Gertler's Fleurette Group, stated that "[a]ll our payments have ceased forthwith . . . [w]e've got U.S. directors, and we are listed on the Nasdaq. We cannot entertain doing business and transacting in any form."

66. Bloomberg also reported that Glencore made this decision "without public approval from U.S. authorities, as part of an effort to keep access to valuable mining assets."

67. Additionally, Glencore called the payments to Gertler "the only viable option to avoid the material risk of seizure" of its Mutanda Mining and KCC assets in the DRC.

68. Glencore announced that the payments to Gertler would be made in euros through a non-U.S. financial institution. A spokesman said Glencore discussed

the matter with U.S. and Swiss authorities, but declined to confirm whether the U.S. would pursue secondary sanctions.

69. According to Elisabeth Caesens, a DRC expert and director of Brussels-based Resource Matters Glencore, "Glencore seems more afraid of Gertler's striking power in Congo's courts than of U.S. sanctions". "Time will tell if this is the right bet, it's arguably not the most ethical one," she said.

70. Despite this, Glencore falsely assured investors that believed it was complying with U.S. sanctions.

*d. Glencore's "gift" to the DRC*

71. Katanga Mining jointly owns KCC with Gécamines. Katanga Mining owns 75% while Gécamines owns 25%. Gécamines accused Glencore of piling excessive levels of debt on Katanga Mining.

72. On April 20, 2018, Gécamines commenced legal proceedings in DRC to dissolve KCC following KCC's failure to address its previously disclosed capital deficiency or, alternatively, requested the appointment of an expert to assess and report to the court on KCC's financial position and the recapitalization plan.

73. On June 12, 2018, Glencore announced that it had agreed to a settlement with Gécamines for the resolution of the capital deficiency at KCC. Glencore highlighted the settlement, disclosing that Katanga Mining and Gécamines' shareholdings in KCC remain unchanged at 75% and 25% respectively, and that KCC would waive its entitlement to replacement reserves and associated incurring of drilling costs on Gécamines' behalf, amounting to US$285 million and US$57 million respectively.

74. Analysts saw this as an overall positive, noting, "[t]he settlement appears to solve one of four DRC related risks for Glencore and improves relations with an important stakeholder," said analysts at JPMorgan. "Glencore's consolidated net debt does not change as a result of the recapitalisation and in practical terms we

believe the key impact will be slower upstreaming of cash from KCC to Glencore," they added.

75. However, on March 1, 2019, Glencore announced that Glencore through Katanga Mining and KCC was "gifting" $1.4 billion to Gécamines, in addition to the waiver of $285 million of debts and costs to Gécamines. This resulted in a payoff of over $1.6 billion to the DRC government to keep its assets in the DRC.

* * *

76. Glencore's business dealings in the DRC and with Gertler subjected the company to heightened risks that eventually would lead to increased costs to Glencore and its investors, and multiple investigations in Glencore's wrong-doing. *See* Section D, "Investigations into Glencore."

77. The investigations and payments are a direct result of Glencore's illegal bribery scheme in the DRC, its relationship with Gertler, and its continued payments to Gertler despite U.S. imposed sanctions.

2. *Venezuela*

78. Beginning on March 30, 2001, two Venezuelan nationals, Francisco Morillo ("Morillo") and Leonardo Baquero ("Baquero"), formed an energy consultancy firm called Waltrop Consultants, C.A. ("WTRPC") in Venezuela. WTRPC's ostensible purpose was to provide market intelligence to energy traders doing business in Venezuela and with the Venezuelan state-owned energy company Petróles de Venezuela, S.A. ("PDVSA").

79. On January 30, 2004, Morillo and Baquero formed an energy advisory and trading firm called Helsinge, Inc., which they incorporated in Panama. Helsinge was originally located in Caracas, Venezuela, but Helsinge and WTRPC thereafter relocated their principal place of business to Miami, Florida. Helsinge also maintains offices in Geneva, Switzerland and Saint-Helier, Jersey, in the Channel Islands. Helsinge and WTRPC describe themselves as energy advisory firms.

80. PDVSA's policy is to buy and sell products only from traders whom it has preapproved for doing business with PDVSA. From 2004 to 2011, neither Helsinge, WTRPC, nor any other of Morillo and Baquero's companies were approved as authorized oil and gas traders with PDVSA.

81. Notwithstanding this fact, in 2004, Morillo and Baquero leveraged their contacts within PDVSA's Commercial and Supply Department and entered into an illicit agreement with several business managers at PDVSA whereby Morillo and Baquero would pay the PDVSA employees bribes in exchange for advance and confidential information concerning PDVSA's future tenders for its purchases and sales of hydrocarbon products and the bids made by competing oil traders.

82. Among the key business managers coordinating this illicit scheme from within PDVSA were Rene Hecker (the business manager of the Commercial and Supply Department until 2013), Marco Malave (Head of the PDVSA Commercial and Supply Department from 2012 to 2017), Edgar Garcia (a business manager in PDVSA's Freight and Transport Department until 2008), and Ysmel Serrano (the current Head of PDVSA's Commercial and Supply Department) (each, a "Bribed PDVSA Employee" and, collectively, the "Bribed PDVSA Employees").

83. Morillo and Baquero then promised and delivered to Glencore and its senior traders the advance and confidential information, including full details of competing bids as well as PDVSA's confidential inside information concerning PDVSA's future tenders months before the marketplace received the same information from PDVSA.

84. The advance receipt of this confidential PDVSA information provided Glencore and its traders with an acute advantage over their marketplace competitors in "winning" the tenders offered by PDVSA. Many of these disadvantaged competitors are oil trading companies in the United States.

85. Morillo and Baquero, acting through Helsinge and other Morillo and Baquero owned companies, (including: (1) Societe Doberan, S.A.; (2) Societe Hedisson, S.A.; (3) Societe Hellin, S.A.; (4) Homberg Inc.; (5) Godelheim, Inc.; (6) Glencore de Venezuela, C.A.; and (7) Jehu Holding, Inc.) provided inside proprietary PDVSA information as well as access to the Bribed PDVSA Employees to Glencore. In return, Glencore paid Helsinge and/or the other companies fees or "commissions" for the receipt of the inside information and rigged tenders. These payments compensated Morillo and Baquero for serving as the "middle man" for the sale of PDVSA's confidential proprietary information and were also the funds ultimately used in part for the bribe payments to the Bribed PDVSA Employees.

86. Glencore expended substantial time and resources to conceal their illicit conduct, including by fraudulently generating fictitious "agency" or "advisory" agreements between the Morillo and Baquero companies and Glencore whereby Glencore purportedly "retained" the Morillo and Baquero companies as "market research" or "business intelligence" firms to assist Glencore's "liaison" with PDVSA.

87. These fictitious agency and advisory agreements were generated between Morillo and Baquero and Glencore to provide the facade of legitimacy to the bribe payments being funneled by Glencore, through the companies, to the corrupt PDVSA agents and officials, and other co-conspirators, in furtherance of their bid-rigging, price-fixing and other schemes.

88. Importantly, the agency or advisory agreement entered into by Glencore with one or more Morillo and Baquero companies served as the conduit for the payments to the Bribed PDVSA Employees.

89. These advisory or agency agreements, included non-refundable monthly retainers between $15,000 and $150,000, plus added compensation of $0.05 to $0.22 per barrel of oil product bought from or sold to PDVSA by Glencore as a

result of the companies' "services." These illegal payments lasted from 2004 until at least March 3, 2018, and likely much longer.

90. Morillo and Baquero communicated PDVSA's proprietary tender information and the third-parties' competing bids to Glencore in different ways.

91. For example, Morillo and Baquero and the Bribed PDVSA Employees communicated via numerous private email accounts using a litany of aliases to conceal their identities. For example, Rene Hecker (one of the Bribed PDVSA Employees) used a private email account at sclups@gmail.com to communicate with Morillo at either Morillo's WTRPC email account or one of his many private email accounts, including franciscomorillo@cantv.net, whereby Hecker or one of his complicit subordinates would provide Morillo and Baquero with the details concerning upcoming PDVSA tenders.

92. Morillo and Baquero would then relay PDVSA's proprietary information concerning future tenders to Glencore at their corporate email accounts or, at other times, to Glencore senior traders' private email accounts, including Luis Alvarez (the former global head of crude-oil trading) and Gustavo Gabaldon (an oil products trader) and former Glencore Business Development Executive, Sergio De La Vega.

93. Glencore would then instruct Morillo and Baquero on how to rig selected future tenders in such a manner so as to either ensure (1) that they would win those tenders by being the only bidders able to fulfill the quantitative and qualitative terms of the rigged tenders or (2) that their bids would beat the bids of competing oil traders.

94. Morillo and Baquero would then relay Glencore's directives to the Bribed PDVSA Employees over private email to ensure the targeted future tenders were modified accordingly.

95. Separate and apart from the use of private emails to disseminate PDVSA's proprietary and confidential information, Morillo and Baquero, with the assistance of certain Bribed PDVSA Employees, particularly Luis Liendo, set up a "clone server," and related interconnected electronic means to gain immediate access to PDVSA's confidential information.

96. Thus, Morillo and Baquero had direct "real time" access into PDVSA's computer system in the Commercial and Supply Department. This enabled Morillo and Baquero to access PDVSA's confidential information, including with respect to its future tender contracts and the real time competing bids submitted by Glencore's market competitors for tenders already released by PDVSA for competitive bidding.

97. Morillo and Baquero would then either share with Glencore their real-time access to PDVSA's computer system or communicate the competing bid information to Glencore via private email or through Instant Message Boards in which Morillo and Baquero and the Glencore traders, using aliases to conceal their identities, would discuss the competing third-party bids.

98. This information was revealed in a lawsuit filed on March 3, 2018 in the United States District Court, Southern District of Florida, Case No. 1:18-cv-20818-DPG.

99. Glencore's 2018 Annual Report filed on March 1, 2019 elaborated about the DOJ's investigation into Venezuela. It stated: "Its [Glencore's] activities in Venezuela over the period which is subject to the investigation cover certain oil offtake contracts with the Venezuelan national oil company, Petróleos de Venezuela."

100. It added: "On receipt of the subpoena, the Glencore Board of Directors reconstituted the existing Investigations Committee to assess the implications of the investigation and to oversee the Company's response to the DoJ's investigation."

101. "This Committee has engaged external independent legal counsel in the US to lead the investigation, who has in turn appointed forensic accountants to assist in the investigation."

102. At all times during the Class Period, Glencore hid the fact that it participated in bribery in Venezuela to win oil offtake contracts and therefore was subject to a heightened risk of investigations. Instead, Glencore promised investors that Glencore was committed to ethics and anti-corruptions. In reality, Glencore's actions subjected investors to a heightened risk of investigations that ultimately came to bear as Glencore became the subject of a number of investigations. *See* Section D, "Investigations into Glencore."

*3. Nigeria*

103. Glencore also participated in a bribery scheme in Nigeria for the purchase and sale of oil off-take agreements. Glencore admitted to investors that the DOJs investigation into Nigeria is related to similar conduct regarding the oil offtake agreements in Venezuela.

104. Glencore's 2018 Annual Report filed on March 1, 2019 elaborated about the DOJ's investigation into Nigeria. According to the annual report, the DOJ's investigation into Glencore's activities in Nigeria is focused on agreements to secure oil supplies for its trading arm. In the annual report, Glencore's auditor Deloitte notes the company's activities in Nigeria within this period were "limited primarily to oil offtake agreements."

105. It added: "On receipt of the subpoena, the Glencore Board of Directors reconstituted the existing Investigations Committee to assess the implications of the investigation and to oversee the Company's response to the DoJ's investigation."

106. "This Committee has engaged external independent legal counsel in the US to lead the investigation, who has in turn appointed forensic accountants to assist in the investigation."

107. At all times during the Class Period, Glencore hid the fact that it participated in bribery in Nigeria to win oil offtake contracts and therefore was subject to a heightened risk of investigations. Instead, Glencore promised investors that Glencore was committed to ethics and anti-corruptions. In reality, Glencore's actions subjected investors to a heightened risk of investigations that ultimately came to bear as Glencore became the subject of a number of investigations. *See* Sections D-E.

**C. Management Promoted Glencore's High Integrity.**

108. Despite Glencore's heavy involvement and history with bribery and association with high risk individuals, throughout the Class Period, Defendants consistently emphasized Glencore's highest ethical standards. In fact, Defendants boasted that "Glencore takes ethics and compliance very seriously" and that it is "committed to complying with or exceeding the laws and external requirements applicable to [its] operations". Glencore assures investors that it manages its risks through the "Glencore Corporate Practice" program that is detailed in its code of ethics and code of conduct.

109. Similarly, Glencore assured investors that they were committed to "operat[ing] transparently and responsibly" and that it "seek[s] to maintain a culture of ethical behaviour and compliance throughout [Glencore], rather than simply performing the minimum required by laws and regulations."

110. Glencore promised investors that "[r]egarding going into these countries risks, we will assess it carefully. We'll operate in a responsible, lawful and sustainable manner. If we do operate in these countries and -- we'll continue as long as we do it correctly."

111. These statements were materially false and misleading as Glencore had a history of routinely engaging in foreign bribery to win contracts and business that subjected Glencore to heightened risks of investigations into Glencore's compliance

with money laundering and bribery laws, as well as the FCPA. Additionally, in reality, Glencore was more concerned with keeping assets and financial results than it was with complying with laws and requirements to its operations.

112. Regarding the payments to Gertler, Glasenberg told the public and investors, "We've got to follow the correct procedures and we'll come to the right conclusions." Glencore similarly told investors that Glencore was "considering how best to mitigate its risks in relation to these obligations."

113. These statements proved to be false when Glencore decided to ignore U.S. sanctions and continue its relationship and royalty payments to Gertler. Accordingly, throughout the Class Period, Defendants materially misrepresented the fact that Glencore's involvement in bribery and payments that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

114. The specific false statements are set forth below in Section E, "Defendants False and Misleading Statements During the Class Period."

**D. Investigations into Glencore.**

115. The heightened risks of investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA that Glencore hid from investors ultimately came to fruition through investigations by the OSC, the DOJ, the SFO, and the CFTC. The investigations examined Glencore's conduct as far back as 2007, and covered Glencore's business dealing up to the present. As a result of these misrepresentations, investors were materially harmed.

1. *The Ontario Securities Commission Investigation*

116. On July 27, 2017, the Wall Street Journal reported that Glencore was subject to an investigation by the OSC for over $100 million in payments made by Katanga Mining to Gertler. This was related to the royalty payments that Glencore

was supposed to make to Gécamines, but instead made the payments to one of Gertler's businesses.

117. On November 20, 2017, Glencore issued a press release noting the announcement of its subsidiary Katanga Mining. In pertinent part, Glencore admitted that Katanga Mining was advised by the OSC that the OSC enforcement staff are investigating, among other things, whether Katanga Mining's previously filed periodic public disclosures contain statements that are misleading in a material respect and the adequacy of Katanga Mining's corporate governance practices and compliance with those practices and the related conduct of certain directors and officers of Katanga Mining. Katanga Mining also disclosed that it had been advised that OSC enforcement staff are reviewing Katanga Mining's risk disclosure in connection with applicable requirements under certain international bribery, government payment and anti-corruption laws.

118. On December 18, 2018, Glencore announced that Katanga Mining has entered into a settlement agreement with the OSC to settle allegations by Canadian regulators that it had failed to comply with disclosure requirements, including that it had not properly described risks of doing business with Gertler.

119. It was also announced that the OSC investigation focused in part on the royalty payments made to Gertler. It also revealed that since 2014, Katanga Mining's stock exchange filings had omitted the identity of the recipient of royalties and signature bonus payments when the beneficiary was in fact Gertler.

120. As part of the Settlement, the OSC announced that "Katanga [Mining] admit[ed] it failed to disclose material risks to its business, specifically: the elevated risk of public sector corruption in the Democratic Republic of the Congo (DRC) and the nature and extent of Katanga's reliance on individuals and entities associated with Dan Gertler. Gertler's close relationship with Joseph Kabila, the President of

the DRC, and allegations of Gertler's possible involvement in corrupt activities in the DRC were referred to in media and non-governmental reports."

121. This confirmed that Glencore and its subsidiary, Katanga Mining, had failed to disclose the heightened risk of doing business with Gertler and the risk of investigations due to bribery. "The picture painted by the Ontario Securities Commission indicates that Glencore used Gertler and his associates to manage relationships with the DRC government," said Peter Jones, Campaign Leader at Global Witness.

2. *The U.S. Department of Justice Investigation*

122. On July 3, 2018, the company announced that it received a subpoena from the DOJ "to produce documents and other records with respect to compliance with the Foreign Corrupt Practices Act and United States money laundering statutes." The requested documents relate to the Glencore Group's business in the DRC, Venezuela, and Nigeria from 2007 to present.

123. In Glencore's 2018 Annual Report published on March 1, 2019, Glencore elaborated about the DOJ's investigation into Nigeria and Venezuela. According to the annual report, the DOJ's investigation into Glencore's activities in Nigeria and Venezuela is focused on agreements to secure oil supplies for its trading arm.

124. In the annual report, Glencore's auditor Deloitte notes the company's activities in Nigeria within this period were "limited primarily to oil offtake agreements." It goes on to say: "Its [Glencore's] activities in Venezuela over the period which is subject to the investigation cover certain oil offtake contracts with the Venezuelan national oil company, Petróleos de Venezuela."

125. It added: "On receipt of the subpoena, the Glencore Board of Directors reconstituted the existing Investigations Committee to assess the implications of the investigation and to oversee the Company's response to the DoJ's investigation."

126. "This Committee has engaged external independent legal counsel in the US to lead the investigation, who has in turn appointed forensic accountants to assist in the investigation."

3. *Britain's Serious Fraud Office Investigation*

127. In May 2018, Bloomberg reported that Britain's SFO was considering a bribery investigation into Glencore's dealing with Gertler and DRC President Joseph Kabila. However, the investigation was ultimately much broader.

128. On December 5, 2019, Glencore issued a press release revealing that a formal investigation was being conducted by the SFO "into suspicions of bribery in the conduct of business of the Glencore group."

129. The UK's SFO confirmed that "it is investigating suspicions of bribery in the conduct of business by the Glencore group of companies, its officials, employees, agents and associated persons."

130. Glencore announced that it would cooperate with the SFO probe, but did not provide further details.

131. According to RBC Capital Markets analyst Tyler Broda said: "This is an obvious negative for the Glencore investment case and adds to the complications of the ongoing US Department of Justice and CFTC investigations around activities in DRC, Venezuela and Nigeria."

132. "The scope of the SFO investigation, albeit with limited detail, appears to be wider . . . and potentially increases the overall penalty should Glencore be eventually found guilty or reach a settlement . . . we believe this clearly will hamper sentiment in what remains a complex investment case for investors."

4. *The U.S. Commodity Futures Trading Commission Investigation*

133. On April 25, 2019, Glencore disclosed that the CFTC notified the company of an investigation into whether the company violated certain provisions

of the Commodity Exchange Act and/or CFTC Regulations through corrupt practices in connection with commodities.

134. Glencore indicated that the CFTC's investigations was in an early stage and had a similar scope in terms of subject matter as the current ongoing investigation by the DOJ – an investigation into Glencore's compliance with the FCPA and United States money laundering statutes due to Glencore's business in Nigeria, the DRC and Venezuela from 2007 to present.

5. *Other Investigations*

135. Glencore is also being investigated on other unrelated matters by the DOJ, the Federal Bureau of Investigation and Brazilian authorities in the "Car Wash" scandal, a money laundering investigation that expanded to cover allegations of corruption at Petrobras, where executives allegedly accepted bribes in return for awarding contracts to construction firms at inflated prices.

* * *

136. Glencore hasn't made a provision in its accounts for its legal woes because it's unable to estimate the quantum of fines and legal damages that could arise.

137. Below is a brief timeline of relevant events:

(a) February 13, 2017: Glencore buys out Gertler with $1 billion DRC Mining Deal.

(b) July 26, 2017: Katanga Mining is reportedly the subject of the OSC's investigation of more than $100 million in payments made to a company owned by Gertler.

(c) November 2017: The "Paradise Papers" leaks reveal confidential board minutes that show Glencore pushed for Gertler to personally negotiate mining licenses in favor of Katanga Mining, and provided him with tens of millions of dollars in loans and options in return.

(d) November 20, 2017: the OSC opens investigation into Katanga Mining's previously filed periodic public disclosures, and the adequacy of Katanga Mining's corporate governance practices and risk disclosures in connection with international bribery, government payment and anti-corruption laws.

(e) December 21, 2017: the US Treasury issues sanctions against Gertler. This means that any individual or company, even outside the U.S., that does business with Gertler risks being fined or even sanctioned by the U.S. Office of Foreign Assets Control.

(f) March 3, 2018: PDVSA Lawsuit filed against Glencore detailing alleged fraud in Venezuela.

(g) April 20, 2018: Congolese state-owned company Gécamines launches legal action to dissolve KCC.

(h) April 27, 2018: Gertler files suit to freeze Glencore's assets and sues Glencore for nearly $3 billion after Glencore had halted contractual payments to Gertler following U.S. sanctions.

(i) May 18, 2018: Bloomberg reports the SFO is preparing to investigate Glencore's dealings with Gertler.

(j) June 12, 2018: Glencore settles the Gécamines legal disputes out of court.

(k) June 15, 2018: Glencore settles the Gertler legal disputes by resuming royalty payments in euros instead of dollars.

(l) July 3, 2018: Glencore receives a subpoena from the DOJ focused on Glencore's operations in the DRC, Nigeria and Venezuela.

(m) December 18, 2018: Glencore announces a settlement agreement with OSC where "Katanga [Mining] admits it failed to disclose material risks to its business, specifically: the elevated risk of public sector

corruption in the Democratic Republic of the Congo (DRC) and the nature and extent of Katanga's reliance on individuals and entities associated with Dan Gertler. Gertler's close relationship with Joseph Kabila, the President of the DRC, and allegations of Gertler's possible involvement in corrupt activities in the DRC were referred to in media and non-governmental reports."

(n) March 1, 2019: Glencore discloses that the June 2018 settlement with Gécamines resulted in a "gift" to Gécamines of $1.4 billion plus the $248 million in other payments and write-downs.

(o) April 25, 2019: The CFTC notifies the company of an investigation of corrupt practices in connection with commodities similar in scope to the DOJ investigation.

(p) December 5, 2019: Glencore and the SFO announce an investigation into suspicions of bribery in the conduct of business by the Glencore group of companies, its officials, employees, agents and associated persons.

138. As a result of Defendants' misconduct in the DRC, Venezuela, and Nigeria, Glencore was subject to heightened risks of investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA that Glencore hid from investors for over a decade. As a direct result of Glencore's improper conduct as described above, multiple regulatory authorities launched extensive investigations in Glencore. This caused Defendants' stock to plummet, harming innocent investors who relied on Defendants' materially false and misleading statements.

**E. Defendants False and Misleading Statements During the Class Period.**

139. During the Class Period, Glencore made materially false and misleading statements or omissions regarding Glencore's involvement in bribery

and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA. As a result of these misrepresentations, investors were materially harmed.

*Bloomberg Article – September 30, 2016*

140. On September 30, 2016, Bloomberg published an article stating that Glencore was reviewing allegations involving the bribery of officials in the DRC said to implicate its business partner. The article quoted a statement by Glencore that the company "takes ethics and compliance very seriously[,]" and reported, in relevant part:

> (Bloomberg) -- Glencore Plc, the world's biggest commodity trader, is reviewing allegations by U.S. authorities regarding the bribery of officials in the Democratic Republic of Congo said to implicate its partner, Israeli billionaire Dan Gertler.
>
> Some of Gertler's projects in Congo were funded by Och-Ziff Capital Management Group LLC, which on Thursday agreed to pay more than $400 million to settle a U.S. investigation that it committed bribery violations in Africa. Och-Ziff's partner in Congo paid $100 million in bribes to government officials over a 10-year period to win access to mining assets, according to an agreement between Och-Ziff and the U.S. Justice Department.
>
> That partner was Gertler, according to a person with knowledge of the matter, who asked not to be identified because the matter is private.
>
> ***"We are aware of the matter and the allegations," Glencore said in an e-mailed statement on Friday. "Glencore takes ethics and compliance very seriously and is considering this information."***
>
> None of the allegations relate to projects involving Glencore and the company hasn't been accused of any wrongdoing. Gertler has not been charged with any crime and disputes the allegations.

(Emphasis added.)[1]

141. The above statements were materially false and misleading because Glencore materially misrepresented that it "takes ethics and compliance" seriously and misrepresented to investors that Gertler acted outside of Glencore's instructions when engaging in bribery. In reality, Glencore routinely issued bribes to enter into countries and directed Gertler to make bribes on its behalf. Additionally, Defendants stated that they were "considering this information" when it already knew it had made illegal bribery payments to the DRC through Gertler.

142. These statements materially misrepresented that Glencore took compliance and bribery allegations seriously, when in fact Glencore had a history of engaging in bribery in the DRC, and was currently engaged in bribery in Venezuela and Nigeria. This misled investors as to the heightened risks that Glencore faced due to Glencore's involvement in bribery, and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies for violation of money laundering and bribery laws, as well as the FCPA.

*Glencore Press Release – February 13, 2017*

143. On February 13, 2017 Glencore announced that it had purchased Gertler's stakes in Katanga and Mutanda for $534 million. The Press release was published on Glencore's website. In pertinent part the press release stated:

> Glencore has today purchased from subsidiaries of Fleurette Properties Limited ("Fleurette") the Fleurette group's remaining 31% stake in Mutanda Mining Sarl (the "Mutanda Shares") and an approximate 10.25% stake in Katanga Mining Limited (the "Katanga Shares").
>
> The consideration for the Mutanda Shares and the Katanga Shares has been determined based on an analysis by BMO Capital Markets Limited who was engaged by Glencore to provide an independent view

[1] Throughout the Complaint emphasis is added unless otherwise specified.

> as to the value of the Mutanda Shares and Katanga Shares for the purposes of the transaction.
>
> The consideration for the Mutanda Shares is US$922 million and the Katanga Shares is US$38 million.
>
> Glencore will set-off against the cash consideration payable to Fleurette, loans owing to the Glencore group by Fleurette and its affiliates, and secured over the Mutanda Shares, amounting to US$556 million of which US$120 million comprises accrued interest. In addition, Glencore has acquired shareholder loans owed to the Fleurette group by Mutanda Mining Sarl in the amount of US$130 million.
>
> Accordingly, the aggregate cash consideration payable by the Glencore group in respect of the transactions is US$534 million.

144. According to a Bloomberg article, "[t]he deal allows Glencore to end a relationship that has brought much scrutiny, both for corruption investigations into Gertler and for the close nature in which the two companies developed their business. The deal also allows Glencore to take full ownership of the mines as commodity prices recover from a three-year lull. . . . It also puts some distance between Glencore and Gertler, four months after the company said it was reviewing bribery allegations said to implicate the billionaire."

145. However, while Glencore bought Gertler's share in their two joint-venture mines, it was still required to pay Gertler royalties he acquired from the Gécamines, in earlier deals.

146. The above press release was materially misleading because it failed to disclose that payments to Gertler resulted in a heightened risks of violating money laundering and bribery laws, as well as the FCPA. This information was material to investors as at this point, investors were unaware that Glencore was subject to heightened risks of investigations by regulatory agencies.

*Annual Report 2016 – March 2, 2017*

147. On March 2, 2017, Glencore issued its annual report, which provided its financial results and position for the fiscal year ended December 31, 2016 (the "2016 Annual Report"). The Annual Report was signed by Glasenberg and Anthony Hayward "on behalf of the Board." The 2016 Annual Report provides Glencore's policy as to complying with corruption laws, stating in relevant part:

> *Risk* - We are exposed to and subject to extensive laws including those relating to bribery and corruption, taxation, anti-trust, financial markets regulation, management of natural resources, licences over resources owned by various governments, exploration, production and post-closure reclamation. The terms attaching to any permit or licence to operate may also be onerous. Furthermore, in certain countries title to land and rights and permits in respect of resources are not always clear or may be challenged.
>
> * * *
>
> *Comments* - ***We are committed to complying with or exceeding the laws and external requirements applicable to our operations and products***. Through this and monitoring of legislative requirements, engagement with government and regulators, and compliance with applicable permits and licences, we strive to ensure full compliance. We also seek to manage these risks through the Glencore Corporate Practice (GCP) programme. Its practical application across our business is detailed in our code of conduct (http://www.glencore.com/who-we-are/our-values/policies/) and this framework is reflected in our sustainability reports. The Group's anti-corruption policy may also be found at: http://www.glencore.com/who-we-are/our-values/policies/.
>
> Bribery and corruption risks re-main highly relevant for businesses operating in emerging markets as shown by recent regulatory enforcement actions both inside and outside the resources sector.

148. The above statements were materially false and misleading. While Glencore purported to warn investors of bribery risks, Glencore failed to disclose the fact that it was already engaged in bribery in the DRC, Venezuela, and Nigeria. For example, confidential board minutes show that Gertler personally negotiated

mining licenses in favor of Katanga Mining, that Glencore pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in loans and options as a reward. Additionally, Glencore was engaged in bribery schemes in Venezuela and Nigeria in order to gain a market advantage in trading oil off-take agreements.

149. It also failed to disclose that Glencore was making payments to Gertler, and the substantial risks in doing so. Accordingly, Glencore failed to warn investors that Glencore was subject to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

## F. The Truth Begins to Emerge.

*Wall Street Journal Article – July 27, 2017*

150. On July 27, 2017, the Wall Street Journal reported that Glencore was subject to an investigation by the OSC for over $100 million in payments made by Katanga Mining to Gertler. This was related to the royalty payments that Glencore was supposed to make to Gécamines, but instead made to one of Gertler's businesses. The articles states in pertinent part:

> LONDON— Glencore PLC is subject to a Canadian investigation of more than $100 million in payments a subsidiary made to a company owned by an Israeli businessman who has been accused of bribing Democratic Republic of the Congo officials, said people familiar with the probe.
>
> The investigation by securities regulators stems from payments that a Canada-based copper-mining company controlled by Glencore and that operates in Congo was expected to make to Congo's state-run mining company, Gecamines, but instead sent to a Caymans Island company owned by the Israeli businessman, Dan Gertler. Glencore has acknowledged the shift in payments and said it was done at the request of Gecamines.

> Canada's Ontario Securities Commission, the country's biggest regional securities regulator, is investigating whether the Glencore subsidiary, Katanga Mining, violated rules requiring that companies disclose business done with their own investors, said the people familiar with the investigation. Katanga is listed in Toronto and Mr. Gertler's company has invested in its business.
>
> * * *
>
> Under a deal with the Congolese government, Gecamines is allocated a slice of annual sales from Katanga Mining subsidiary Kamoto Copper Co., known as KCC. But rather than send the royalties to Gecamines, KCC has been sending them to Mr. Gertler's Cayman Islands-based company, Africa Horizons Investment Ltd., Glencore and Fleurette have said.
>
> Glencore and Fleurette have said Gecamines wanted the money shifted to Mr. Gertler's company to pay back a $196 million loan Fleurette made to Gecamines in 2013. The payments are ongoing, they said.
>
> * * *
>
> The probe represents a new risk posed by Glencore's longtime relationship with Mr. Gertler, from whom the company has sought to distance itself in recent months.

151. This partially revealed to the market that Glencore and/or its subsidiary was under investigation by the OSC. It also partially revealed that Glencore and its subsidiaries were subject to heightened scrutiny by U.S. and foreign government bodies as a result of its association with Gertler and payments being made to Gertler. This led to a heightened risk that Glencore would be subject to investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

152. This information was material to investors and resulted in a decline to Glencore's securities.

153. On this news, shares of GLNCY fell from an open of $8.68 per share on July 27, 2017, to a low of $8.52 per share on July 27, 2017, a drop of over 1.8%.

Similarly, shares of GLCNF fell from an open of $4.35 per share on July 27, 2017, to close at $4.29 per share on July 27, 2017, a drop of over 1.3%.

*Half Year Report 2017 – October 8, 2017*

154. On March 2, 2017, Glencore issued its annual report, which provided its financial results and position for the fiscal year ended December 31, 2016 (the "2016 Annual Report") and was published on Glencore's website.

155. In the "Chief Executive Officer's Review" section, Glasenberg discusses Glencore's Corporate governance. He states in pertinent part:

> **Corporate Governance and Sustainability**
> Our ambition to fully integrate sustainability throughout our business remains a key strategic priority for the Group and reflects ***our commitment to operate transparently and responsibly.*** It also encompasses our desire to protect the wellbeing of our people, our host communities and the natural environment, while sharing lasting benefits with the regions where we work and society as a whole.

156. The above statements were materially false and misleading. While Glencore purported to operate transparently and responsibly, Glencore hid the fact that it was already engaged in bribery in the DRC, Venezuela, and Nigeria. For example, confidential board minutes show that Gertler personally negotiated mining licenses in favor of Katanga Mining, that Glencore pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in loans and options as a reward. Additionally, Glencore was engaged in bribery schemes in Venezuela and Nigeria in order to gain a market advantage in trading oil off-take agreements.

157. It also hid the fact that Glencore was making payments to Gertler, and the substantial risks in doing so. Accordingly, Glencore failed to warn investors that Glencore was subject to heightened scrutiny by U.S. and foreign government bodies

resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

*Glencore Press Release – November 20, 2017*

158. On November 20, 2017, Glencore issued a press release that its subsidiary Katanga Mining had issued a restatement, that three of Katanga Mining's directors had resigned and that the OSC was investigating Katanga Mining. The Press release was published on Glencore's website. The Press Release statements in pertinent part:

> Following the resignation of three Katanga directors, Glencore has nominated three new directors to the Board of Katanga, including Steven Kalmin (Glencore's CFO), to work with the independent directors of Katanga to implement the required remediation measures to strengthen Katanga's corporate governance, compliance and control processes.
>
> Glencore will also be implementing various structural and control changes across its copper department in order to enhance and strengthen its financial processes and procedures.
>
> Glencore is committed to ensuring that the weaknesses identified in the Review are addressed and do not reoccur.
>
> The adjustments arising from the Review do not have a material adverse effect on the consolidated income, financial position or cash flows of Glencore.
>
> Glencore also notes Katanga's announcement that it has been advised by the Ontario Securities Commission ("OSC") that the OSC enforcement staff are investigating, among other things, whether Katanga's previously filed periodic public disclosures contain statements that are misleading in a material respect and the adequacy of Katanga's corporate governance practices and compliance with those practices and the related conduct of certain directors and officers of Katanga. Katanga has also been advised that OSC enforcement staff are reviewing Katanga's risk disclosure in connection with applicable

> requirements under certain international bribery, government payment and anti-corruption laws.

159. The above press release confirmed the Wall Street Journal's report that the OSC was investigating Katanga Mining, and partially revealed that Glencore and its subsidiaries were subject to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

160. This information was material to investors and resulted in a decline to Glencore's securities.

161. On this news, shares of GLNCY fell from a high of $9.49 per share on November 20, 2017, to a low of $9.35 per share on November 20, 2017, a drop of over 1.4%. Similarly, shares of GLCNF fell from a high of $4.78 per share on November 20, 2017, to a low of $4.70 per share on November 20, 2017, a drop of over 1.6%.

*Bloomberg Article – February 22, 2018*

162. On February 22, 2018, Bloomberg published an article regarding Gertler's designation as an SDN, and Glencore's owed royalty payments to Gertler. The Bloomberg article quoted Defendant Glasenberg, stating in pertinent part:

> While the Swiss company [Glencore] pledged to honor the sanctions, it says it is still reviewing its contractual obligations and if it will continue to make the payments.
>
> "***We've got to follow the correct procedures and we'll come to the right conclusions***," said Ivan Glasenberg, the chief executive officer.

163. The above statement made by Glasenberg was materially false and misleading because Glencore materially misrepresented that it "follow[s] the correct procedures" and that it would "come to the right conclusions" about its payments to Gertler. In reality, Glencore routinely failed to follow "the correct procedures" and

issued bribes in the DRC through Gertler. Additionally, this misrepresented that Glencore would comply with U.S. Sanctions, and not subject investors to unreasonable regulatory risks.

164. Accordingly, this statement materially misrepresented that Glencore took compliance seriously, when in fact Glencore had a history of engaging in bribery in the DRC, and was currently engaged in bribery in Venezuela and Nigeria. This misled investors as to the heightened risks that Glencore faced due to Glencore's involvement in bribery, and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies for violation of money laundering and bribery laws, as well as the FCPA.

*Annual Report 2017 – March 2, 2018*

165. On March 2, 2018, Glencore published its Annual Report for the year ended December 31, 2017 (the "2017 Annual Report") on its website. The Annual Report was signed by Glasenberg and John Burton, the company secretary "on behalf of the Board."

166. The 2017 Annual Report identified certain risk factors relating to bribery and corruption. In pertinent part, the press release stated:

> Risk description
>
> We are exposed to extensive laws including those relating to bribery and corruption, sanctions, taxation, anti-trust, financial markets regulation, environmental protection, use of hazardous substances, product safety and dangerous goods regulations, development of natural resources, licences over resources, exploration, production and post-closure reclamation, employment of labour and occupational health and safety standards and preservation. The terms attaching to any permit or licence to operate may also be onerous and obtaining these and other approvals, which may be revoked, can be particularly onerous to comply with. Furthermore, in certain countries title to land and rights and permits in respect of resources are not always clear or may be challenged.

* * *

As a diversified sourcing, marketing and distribution company conducting complex transactions globally, we are exposed to the risks of fraud, corruption, sanctions breaches and other unlawful activities both internally and externally. Our marketing operations are large in scale, which may make fraudulent or accidental transactions difficult to detect. ***In addition, some of our industrial activities are located in countries, such as the DRC, where corruption is generally understood to exist. Corruption and sanctions risks remain highly relevant for businesses operating in international markets as shown by recent regulatory enforcement actions both inside and outside the resources sector.***

Comments/impacts to the Group

Since 2007 the Group has had various business dealings with entities associated with Dan Gertler in connection with its copper assets in the DRC. In December 2017 the United States government designated Dan Gertler and affiliated companies as Specially Designated Nationals (SDNs), thereby imposing blocking sanctions on them and companies owned 50% or more by them, under Executive Order 13818, titled "Blocking the Property of Persons Involved in Serious Human Rights Abuses or Corruption". ***The Group has pre-existing contractual obligations to make royalty and pas-de-porte payments in respect of KCC and Mutanda to certain of these companies which pre-date the SDN designation and which arose when the companies acquired rights from Gecamines. The Group has not made any payment to the companies since the SDN designation. The Group is still considering how best to mitigate its risks in relation to these obligations.***

* * *

During the year, a restatement of past financial statements at Katanga Mining Limited, a subsidiary of the Group, was required and the Ontario Securities Commission is investigating various matters relating to Katanga (see pages 92 and 97).

* * *

Mitigation and risk appetite

> ***We seek to ensure full compliance through our commitment to complying with or exceeding the laws and external requirements applicable to our operations and products and through monitoring of legislative requirements, engagement with government and regulators, and compliance with the terms of permits and licences***. We keep informed of new regulations and legal requirements. We seek to manage the risk of breaching applicable laws and external requirements through our policy framework which is described on page 91. However, there can be no assurance that such policies, procedures and controls will adequately protect the Group against fraud, corruption, sanctions breaches or other unlawful activities.

167. Additionally, the 2017 Annual Report provided Glencore's policy as to its compliance, including relating to bribery and corruption. The 2017 Annual Report stated in relevant part:

> ***We seek to maintain a culture of ethical behaviour and compliance throughout the Group, rather than simply performing the minimum required by laws and regulations***. We will not knowingly assist any third party in breaching the law, or participate in any criminal, fraudulent or corrupt practice in any country.
>
> * * *
>
> **Bribery and corruption**
>
> Glencore's Global Anti-Corruption Policy . . . contains our clear position on bribery and corruption: the offering, paying, authorising, soliciting or accepting of bribes is unacceptable. We conduct analysis for corruption risks within our businesses and seek to address these risks through policies and procedures, training and awareness raising, monitoring and controls.

168. The above information was materially false and misleading. While Glencore purported to warn investors of bribery risks, Glencore failed to disclose the fact that it was already engaged in bribery in the DRC, Venezuela, and Nigeria. For example, confidential board minutes show that Gertler personally negotiated mining licenses in favor of Katanga Mining, that Glencore pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in

loans and options as a reward. Additionally, Glencore was engaged in bribery schemes in Venezuela and Nigeria in order to gain a market advantage in trading oil off-take agreements.

169. Accordingly, Glencore failed to warn investors that Glencore was subject to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

170. Additionally, Glencore told investors that it was considering how to mitigate risks relating to the royalty payments owed to Gertler, while at the same time telling investors that Glencore was committed to anti-corruption, ethical behavior, and meeting or exceeding laws. This gave investors the impression that Glencore would avoid US sanctions by complying with the executive order. In reality, Glencore was more concerned with keeping its assets in the DRC than complying with laws.

171. Therefore, the above statements were materially false and misleading.

172. The 2017 Annual Report also partially revealed for the first time that Glencore had made royalty payments to Gertler instead of Gécamines, and the heightened risks associated with making payments to Gertler. This information was material to investors and resulted in a decline to Glencore's securities.

173. On this news, shares of GLNCY fell from a close of $10.27 per share on March 1, 2018, to a low of $9.99 per share on March 2, 2018, a drop of over 2.7%. Similarly, shares of GLCNF fell from a close of $5.20 per share on March 1, 2018, to a low of $5.02 per share on March 2, 2018, a drop of over 3.4%.

*PDVSA Lawsuit – March 3, 2018*

174. On March 3, 2018, the PDVSA US Litigation Trust filed suit against Glencore, among others, for engaging in a substantial and wide-spread bribery

scheme in Venezuela. The pertinent facts of the lawsuit are explained in detail above. *See* Section B.2.

175. This disclosed to investors that Glencore did not prioritize ethics and compliance, but in fact routinely made bribes in Venezuela to win contracts. This also partially revealed to investors that Glencore's involvement in bribery in Venezuela would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

176. This information was material and caused Glencore's securities to significantly decline.

177. On this news, shares of GLNCY fell from a close of $10.17 per share on March 2, 2018, to a low of $9.92 per share on March 5, 2018 (the next trading day), a drop of approximately 2.5%. Similarly, shares of GLCNF fell from a close of $5.10 per share on March 2, 2018, to a low of $4.96 per share on March 5, 2018 (the next trading day), a drop of approximately 2.8%.

*Glencore 2017 Sustainability Report – April 4, 2018*

178. On April 4, 2018, Glencore published on its website its 2017 Sustainability Report. According to Glencore, the 2017 Sustainability Report "forms part of Glencore's annual corporate reporting suite. It expands on the information provided in [its] Annual Report 2017, detailing how [Glencore] address[es] the most material sustainability risks and opportunities [it] faced during the year." The report is signed by Defendants Glasenberg and Kalmin and states in pertinent part:

> We pay all relevant taxes, royalties and levies required by local and national regulation in our host countries. ***The payments we make to the governments of the countries in which we operate include local, national, sales and employment taxes, government royalties and licence and permitting fees***. In addition, we contribute to local economies through our payments to suppliers, wages and employee

> benefits, voluntary support of socioeconomic initiatives such as health and education projects and infrastructure development.

179. With the Sustainability Report, Glencore released a "Payments to Governments Report 2018."

> We believe our reporting of payments to governments and the disclosure requirements placed on governments by initiatives such as the EITI, results in increased transparency and governance that supports an improved understanding of our national economic contribution and equips civil society to hold their governments to account. ***We are committed to high standards of corporate governance and transparency and welcome increased transparency around the redistribution and reinvestment of such payments***. We have been an active supporter of the EITI since 2011. We will continue to promote its principles of transparency and accountability as well as to engage with the EITI at both local and international levels

180. The above statements were materially false and misleading. While Glencore purported to be "committed to high standards of corporate governance and transparency," Glencore hid the fact that it was engaged in bribery in the DRC, Venezuela, and Nigeria. For example, confidential board minutes show that Gertler personally negotiated mining licenses in favor of Katanga Mining, that Glencore pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in loans and options as a reward. Additionally, Glencore was engaged in bribery schemes in Venezuela and Nigeria in order to gain a market advantage in trading oil off-take agreements.

181. This bribery resulted in a heightened risk to Glencore shareholders. Accordingly, Glencore failed to warn investors that Glencore was subject to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

*Katanga Press Release – April 20, 2018*

182. On April 20, 2018, Glencore published a press release on its website directing shareholders to Katanga's press release that disclosed that on April 20, 2018 Katanga's joint venture partner in KCC, Gécamines, commenced legal proceedings in the DRC to dissolve KCC following KCC's failure to address its previously disclosed capital deficiency or, alternatively, requested the appointment of an expert to assess and report to the court on KCC's financial position and the recapitalization plan.

183. The press release also disclosed that Katanga was considering giving equity to KCC, stating in pertinent part:

> The Company [Katanga] is continuing to assess options for regularizing the deficiency, including the conversion of a portion of existing intercompany debt owed by KCC [Kamoto Copper Company] to the Company [Katanga] (which is eliminated on consolidation) into equity or forgiving a portion of such debt. Any such outcome would impact the distribution of future cash flows earned by KCC, which might in turn have a materially adverse impact on the Company but would not be expected to have a material impact on the assets, liabilities and net assets of the Company and would be expected only to result in a shift within equity attributable to shareholders of the Company and non-controlling interests

184. This press release concealed Glencore's on-going bribery schemes in the DRC, Venezuela, and Nigeria. As of this date, Glencore knew it would be gifting over $1.4 billion to Gécamines which the company omitted. This was material because a reasonable investor would consider it when determining whether to invest in Glencore.

185. Accordingly, this press release mispresented Glencore's involvement in bribery that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

*Glencore Press Release – April 27, 2018*

186. On April 27, 2018, Glencore published a press release on its website announcing that Gertler had filed suit against Glencore for failure to make royalty payments and that a court in the DRC had frozen a number of Glencore's assets in the DRC. The press release stated in pertinent part:

> Ventora Development Sasu ("Ventora"), a company affiliated with Mr Dan Gertler, has today served in the Democratic Republic of the Congo ("DRC") freezing orders against Mutanda Mining Sarl ("Mutanda") and Kamoto Copper Company ("KCC"), subsidiaries of Glencore Plc, for approximately $695 million and US$2.28 billion respectively.
>
> Ventora alleges that Mutanda has breached an agreement with Ventora pursuant to which it alleges Mutanda is required to make royalty payments to Ventora by indicating that it will not pay such royalties as a result of Mr Gertler's designation as a Specially Designated National ("SDN"). Ventora asserts that if its claim for breach is upheld it will be entitled to damages of approximately $695 million which it alleges is the value of the future royalties due to it under the agreement.
>
> Ventora alleges that KCC has breached an agreement between KCC, La Générale des Carrières et des Mines ("Gécamines") and Africa Horizons Investments Limited ("AHIL") (which Ventora claims has been assigned to it) pursuant to which it alleges KCC is required to make royalty payments to Ventora by indicating that it will not pay such royalties as a result of Mr Gertler's designation as a SDN. Ventora asserts that if its claim for breach is upheld it will be entitled to damages of approximately US$2.28 billion which it alleges is the value of the future royalties due to it under the agreement.
>
> The freezing orders authorise the bailiff of the Commercial Court of Kolwezi to freeze certain bank accounts, tangible movable assets and intangible movable assets, such as receivables, of each of Mutanda and KCC as well as the mining titles, in each case up to the amount of the freezing order and prevent Mutanda and KCC from disposing and/or utilising these assets.

> In December 2017, the United States government designated Dan Gertler and affiliated companies as SDNs, thereby imposing blocking sanctions on them and companies owned 50% or more by them.

187. The fact that Gertler filed suit to freeze Glencore's assets revealed to the market that Glencore and Gertler disagreed about whether Glencore could make royalty payments to Gertler. Additionally, this revealed to the market that Glencore's prior risk disclosures were deficient because Glencore was under heightened risks due to its relationship and business dealings with Gertler.

188. On this news, shares of GLNCY fell from a close of $10.25 per share on April 26, 2018, to open at $9.65 per share on April 30, 2018 (the next trading day), a drop of approximately 5.9%. Similarly, shares of GLCNF fell from a close of $5.18 per share on April 26, 2018, to open at $4.88 per share on April 30, 2018 (the next trading day), a drop of approximately 5.8%.

*Bloomberg Article – May 18, 2018*

189. On May 18, 2018, Bloomberg reported that the U.K.'s Serious Fraud Office was preparing to open a formal bribery investigation into Glencore. The article stated, in relevant part:

> **Glencore May Face U.K. Bribery Probe Over Congo Dealings**
> By Franz Wild and Suzi Ring
>
> The U.K.'s white-collar crime prosecutor is preparing to open a formal bribery investigation into Glencore Plc and its work with Israeli billionaire Dan Gertler and the leader of Democratic Republic of Congo, according to two people with knowledge of the matter.
>
> Investigators at the Serious Fraud Office plan to seek formal approval for a full probe into Glencore's dealings in Congo, said the people, who declined to be identified because the matter isn't public.
>
> * * *
>
> U.S. hedge fund manager Och-Ziff Capital Management LLC, which funded some of Gertler's operations in Congo, admitted in 2016 to

> having conspired to bribe Congolese officials with the help of an unidentified Israeli businessman. Gertler has denied any wrongdoing and hasn't been charged. Glencore cut ties with him and bought out his stakes in their joint ventures shortly after the Och-Ziff settlement.
>
> An SFO investigation would add to a growing list of legal challenges for Glencore. It's sought to distance itself from Russian oligarch Oleg Deripaska after the U.S. imposed sanctions in April. Glencore is also fighting Gertler over royalties he says the company still owes after they parted ways. And Glencore's state-owned partner in Congo is trying to dissolve a local operation, saying Glencore has overburdened it with debt. The Glencore unit says the debt situation is solvable and dissolving the business is premature.
>
> * * *
>
> Gertler and Glencore first invested together in a Congolese mine in 2007 and developed a close partnership over the years in the Mutanda and Katanga Mining copper and cobalt operations. In 2012, Glencore Chief Executive Officer Ivan Glasenberg said Gertler had been a "supportive" shareholder in Katanga Mining and that his involvement helped attract foreign investment to Congo.
>
> An "SFO investigation would represent a real breakthrough in the fight to keep London-listed corporations accountable for the business they do overseas," Peter Jones from advocacy group Global Witness said in an email. "If an investigation is launched, Glencore's management is going to have to explain the opaque deals it struck with Gertler which cost the Congolese people over half a billion dollars in potential revenues."

190. This partially revealed to the market that Glencore's previously statements regarding compliance and commitments to ethics were materially false and misleading. In realty, Glencore's conduct relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

191. On this news, shares of GLNCY fell $0.55 per share, or over 5%, to close at $10.13 per share on May 18, 2018, while shares of GLCNF fell $0.32 per share, or nearly 6%, to close at $5.06 per share on May 18, 2018.

*Glencore Press Release – June 12, 2018*

192. On June 12, 2018, Glencore published a press release on its website referring shareholders to the announcement by Katanga Mining in which it announced the settlement of the DRC legal dispute with Gécamines and an agreement for the resolution of the capital deficiency at KCC.

193. Glencore highlighted the settlement, disclosing in the press release in pertinent part:

> The key highlights of Katanga's settlement agreement with Gécamines are as follows:
>
> - Conversion of US$5.6 billion of KCC's total debt of approximately US$9 billion into new KCC equity such that, with retroactive effect as at January 1st, 2018, KCC has $3.45 billion of debt to KML Group, bearing interest at the lower of US$ Libor 6 month + 3% and 6% per annum;
> - ***Katanga and Gécamines' shareholdings in KCC remain unchanged at 75% and 25% respectively***;
> - a one-time payment to Gécamines of US$150 million relating to historical commercial disputes;
> - certain amendments to the dividend payment and free cash flow provisions of KCC including an amortization schedule for the repayment of the residual debt;
> - payment of approx. $US 41 million to Gécamines in relation to outstanding expenses incurred as part of an exploration program;
> - ***waiver by KCC of its entitlement (or financial equivalent) to replacement reserves and associated incurring of drilling costs on Gecamines' behalf, amounting to US$285 million and US$57 million respectively***, and
> - withdrawal of all legal action by Gécamines.

194. On June 14, 2018, Glencore announced that the settlement was effective. Analysts saw this a an overall positive, noting, "[t]he settlement appears to solve one of four DRC related risks for Glencore and improves relations with an important stakeholder," said analysts at JPMorgan. "Glencore's consolidated net debt does not change as a result of the recapitalisation and in practical terms we believe the key impact will be slower upstreaming of cash from KCC to Glencore," they added.

195. Bloomberg noted that this was essentially "a $150 million settlement with Congo's state-owned miner and debt restructuring of Glencore's local subsidiary."

196. This press release concealed Glencore's on-going bribery schemes in the DRC, Venezuela, and Nigeria. As of this date, Glencore knew it would be gifting over $1.4 billion to Gécamines which the company omitted. This was material because a reasonable investor would consider it when determining whether to invest in Glencore.

197. Accordingly, this press release mispresented Glencore's involvement in bribery that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

*Glencore Press Release – June 15, 2018*

198. On June 15, 2018, Glencore published a press release on its website referring investors to Katanga Mining's press release providing an update on its April 27, 2018 announcement in respect of freezing orders filed against KCC, by Ventora.

199. In pertinent part, the press release states:

*Baar, Switzerland, 15 June 2018*

> Further to its announcement of 27 April 2018 in respect of freezing orders filed against Mutanda Mining Sarl ("Mutanda") and Kamoto Copper Company SA ("KCC"), subsidiaries of Glencore plc, by Ventora Development Sasu ("Ventora"), a company affiliated with Mr. Dan Gertler, Glencore has carefully considered its legal and commercial options in connection with its dispute with Ventora and Africa Horizons Investments Limited ("AHIL"), also a company affiliated with Mr Dan Gertler, and its obligations to its various stakeholders, including its shareholders, customers and the communities in which it operates in the Democratic Republic of the Congo ("DRC").
>
> ***Glencore and Katanga Mining have determined that in the circumstances the only viable option to avoid the material risk of seizure of its assets under DRC court orders is for Mutanda and KCC to pay the relevant royalties as and when they become due to Ventora in non-US dollars, without involving US persons, in order to discharge their obligations under the terms of the pre-existing contracts***. Mutanda, KCC, Ventora and AHIL have on this basis agreed to withdraw all pending and threatened litigation between them pursuant to a settlement agreement signed by the parties.
>
> Glencore believes that payment in non-US dollars of royalties and access premiums to Ventora without the involvement of US persons would appropriately address all applicable sanctions obligations.

200. On release of this news, the market reacted negatively. Instead of seeing this as a resolution of its problem with payments to Gertler, this partially revealed the fact that further sanctions would likely occur from Glencore's decision to continue its relationship and payments to Gertler. This partially revealed that Glencore's previous statements that it was "committed to complying with or exceeding the laws" in order to assure investors of corporate governance were materially false. In realty, Glencore's association and payments relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign

government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

201. For example, the same day Bloomberg published an article titled "The Israeli Billionaire Forcing Glencore to Buck U.S. Sanctions." Bloomberg stated in pertinent part:

> Not many billion-dollar companies would be willing to circumvent U.S. sanctions for their business partner, but then few people are as powerful as Dan Gertler in the Democratic Republic of Congo.
>
> * * *
>
> "Glencore seems more afraid of Gertler's striking power in Congo's courts than of U.S. sanction," said Elisabeth Caesens, a Congo expert and director of Brussels-based Resource Matters. "Time will tell if this is the right bet, it's arguably not the most ethical one."
>
> * * *
>
> In April, Gertler won a Congo court ruling to seize almost $3 billion of Glencore's assets that could have seen the Israeli take control the company's mines in the country. Paying Gertler is the only way to keep hold of the assets, Glencore said in a statement Friday.

202. Accordingly, on this news, shares of GLNCY fell from $10.54 per share at close on June 14, 2018 to open at $9.91 per share on June 18, 2018 (the first trading day after June 15, 2018), a drop of approximately 6%. Similarly, shares of GLCNF fell from $5.28 per share at close on June 14, 2018 to open at $5.02 per share on June 18, 2018 (the first trading day after June 15, 2018), a drop of approximately 5%.

203. However, but for Glencore's further false statements that it "believe[d]" these payments in non-US dollars would be sufficient to avoid the U.S. sanctions, Glencore's stock would have declined even further. Accordingly, this misrepresented that Glencore would comply with U.S. Sanctions, and not subject investors to unreasonable regulatory risks.

204. In reality, Glencore had no reasonable basis to believe that it was in compliance with U.S. sanctions and therefore, misled investors as to the heightened risks that Glencore faced due to Glencore's involvement in bribery, and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies for violation of money laundering and bribery laws, as well as the FCPA.

*Glencore Press Release – July 3, 2018*

205. On July 3, 2018, pre-market, Glencore published a press release on its website disclosing that the DOJ issued had issued a subpoena to Glencore to produce documents and other records in connection with its compliance with U.S. money laundering statutes and the FCPA. The announcement stated, in relevant part:

> Subpoena from United States Department of Justice
>
> **Baar, Switzerland, 3 July, 2018**
> Glencore Ltd, a subsidiary of Glencore plc, has received a subpoena dated 2 July, 2018 from the US Department of Justice to produce documents and other records with respect to compliance with the Foreign Corrupt Practices Act and United States money laundering statutes. ***The requested documents relate to the Glencore Group's business in Nigeria, the Democratic Republic of Congo and Venezuela from 2007 to present***.
>
> Glencore is reviewing the subpoena and will provide further information in due course as appropriate.

206. The above information confirmed the markets reaction to Glencore's June 15, 2018 press release announcing that it was continuing its relationship and payments to Gertler. Accordingly, this information revealed to the market that Glencore was in violation of U.S. sanctions. This information also revealed that the US government had also taken notice of Glencore's bribery schemes in Nigeria and Venezuela. Finally, this information partially revealed to the market that Glencore's

risk disclosures were woefully deficient, as it failed to warn investors that it had already violated foreign money laundering statutes and the FCPA for making bribes to foreign officials.

207. This information was material and should have been disclosed to investors. When it was revealed to the market, Glencore's securities significantly dropped.

208. On this news, shares of GLNCY fell $0.86 per share, or over 9%, to close at $8.31 per share on July 3, 2018, while shares of GLCNF fell $0.41 per share, or nearly 9%, to close at $4.20 per share on July 3, 2018.

*Glencore Press Release – July 11, 2018*

209. On July 11, 2018 Glencore published a press release on its website updating investors on the subpoena Glencore received from the U.S. Department of Justice. The announcement stated, in relevant part:

> Update on subpoena from United States Department of Justice
>
> **Baar, Switzerland, 11 July, 2018**
> On 3 July 2018, Glencore announced that a subsidiary had received a subpoena from the United States Department of Justice (the "DOJ") to produce documents and other records with respect to compliance with the Foreign Corrupt Practices Act and United States money laundering statutes. ***The requested documents relate to the Glencore Group's business in Nigeria, the Democratic Republic of Congo and Venezuela from 2007 to present***.
>
> ***A committee of the Board has been established to oversee the Company's response to the DOJ subpoena***. This committee comprises the Chairman, Tony Hayward, Leonhard Fischer (Independent Non-Executive Director) and Patrice Merrin (Independent Non-Executive Director).
>
> Chairman Tony Hayward said: "Glencore takes ethics and compliance seriously throughout the Group. The Company will cooperate with the

> DOJ, while continuing to focus on our business and seeking to maximise the value we create for our diverse stakeholders in a responsible and transparent manner."

210. This partially revealed to the market that Glencore's previously statements regarding compliance and commitments to ethics were materially false and misleading. In realty, Glencore's conduct relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA. For example, this information revealed for the first time the severity of the DOJ investigation. Whereas previously, Glencore simply announced that the DOJ had opened an investigation, the disclosure that Glencore had to form a special committee to oversee Glencore's response revealed to investors the severity of the investigation. This confirmed the materiality of failure to adequately warn investors and the severity of the bribery scheme.

211. On this news, shares of GLNCY fell from $8.63 per share at close on July 10, 2018, to a close of $8.10 on July 11, 2018, a drop of over 6%. Similarly, GLCNF fell from $4.32 per share at close on July 10, 2018, to a close of $4.07 on July 11, 2018, a drop of nearly 6%.

*FH1 2018 Earnings Call – August 8, 2018*

212. On August 8, 2018, Glencore held an earnings call for the first half of 2018. Defendants Glasenberg and Kalmin participated on the call. In response to an analyst question about the DOJ investigation and legal risks, Glasenberg indicated that Glencore would continue to operate in countries where bribery was prominent:

> **Liam Fitzpatrick**
> *Deutsche Bank AG, Research Division*
>
> I've got 3 questions. Firstly, on marketing, just with respect to the DOJ subpoena, has there been any impact on trading volumes or funding

costs since then? Secondly, on strategy, ***given your legal issues, does this change your appetite to operate in countries like the DRC going forward?*** And finally, I mean, you touched on this in the release, but when we look at M&A versus buyback, is it fair to say that M&A is very difficult to justify versus your current share price? Or should we still expect you to look at bolt-on deals going forward?

**Ivan Glasenberg**
*CEO & Director*

Yes, the first part of the question, the marketing, no, it's had no effect on our marketing business and no effect on finance available for our marketing business. ***Regarding going into these countries risks, we will assess it carefully. We'll operate in a responsible, lawful and sustainable manner. If we do operate in these countries and -- we'll continue as long as we do it correctly.*** Regarding where we look at M&A, as I said, yes, M&A we'll continue looking at if it is opportunistic, the same way we've always said we'll look at opportunistic-type ideas providing we're getting the right returns that we're looking for in those areas. As I've said today, we would require something around about the 15% IRR. There is not massive opportunities out there today and we haven't seen anything that really looks exciting. But if something comes along, we'll look at it. But if you look along the horizon, we don't see anything that great right now. And potentially, the best thing we could do is returning funds to shareholders or doing share buybacks. That potentially will give us the best returns.

213. Additionally, Kalmin responded to an analyst question about Gertler and the DOJ investigation. The earnings call indicates in pertinent part:

**Jason Robert Fairclough**
*BofA Merrill Lynch, Research Division*
Just 2 quick ones for me, one on the Koniambo and the other one on Dan Gertler. Just first on Koniambo, I see you're ramping up the second line. You spent another $60 million in CapEx. We still don't see any financials. And I guess, what is the latest and how should we think about the trigger to start – actually putting some results through the financials? And maybe you could update us on the carrying value of the asset. ***And then secondly, just on Dan, has your approach to dealing***

***with the issue of payments to Dan Gertler changed since your subpoena from the DOJ?***

* * *

**Steven Kalmin**

*Chief Financial Officer*

Yes, Jason, it was -- obviously, from 1st of January next year is when we'll be looking to bring it in as a typical operation. We'd see all the financial results, EBITDA, the cost structure start building all then, that's the period at which we would see a level of accounting. Commercial productions have been reached. So that's our base case for now and it'll be -- it would have sort of graduated to the big boys club, which is good. ***I think just to that point, I mean, since DOJ, it hasn't reflected how we're sort of the resolution in how we reached obviously the announcement with Ventora back in June, that obviously still continues as is, which was the announcement and how that's being treated and the agreement and the way forward. The whole approach, that's as is from the announcement that was made in June.***

214. The above information was materially false and misleading because it communicated to investors that Glencore would "operate in a responsible, lawful and sustainable manner" and that it would do so "correctly." Accordingly, this misrepresented that Glencore would comply with U.S. Sanctions, and not subject investors to unreasonable regulatory risks.

215. In reality, Glencore had a company-wide practice to put profits before compliance with money laundering and bribery laws, as well as the FCPA. Further, Glencore had no reasonable basis to believe that it was in compliance with U.S. sanctions and therefore, misled investors as to the heightened risks that Glencore faced due to Glencore's involvement in bribery, and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies for violation of money laundering and bribery laws, as well as the FCPA.

*Glencore Press Release – December 18, 2018*

216. On December 18, 2018, Glencore published a press release on its website announcing that Katanga had come to a settlement agreement with the OSC.

217. In pertinent part, the OSC announced that "Katanga admits it failed to disclose material risks to its business, specifically: the elevated risk of public sector corruption in the Democratic Republic of the Congo (DRC) and the nature and extent of Katanga's reliance on individuals and entities associated with Dan Gertler. Gertler's close relationship with Joseph Kabila, the President of the DRC, and allegations of Gertler's possible involvement in corrupt activities in the DRC were referred to in media and non-governmental reports."

218. This partially revealed to the market that Glencore had failed to adequately disclose the heightened risks of making payments to and associating with Gertler. This was material and when the truth was revealed, Glencore's securities significantly dropped.

219. On this news, shares of GLNCY fell from a high of $7.47 per share at open on December 18, 2018 to a low of $7.18 per share on December 18, 2018, a drop of approximately 3.9%. Similarly, shares of GLCNF fell from $3.67 per share at open on December 18, 2018, to close at $3.60 per share on December 18, 2018, a drop of approximately 1.9%.

*Annual Report 2018 – March 1, 2019*

220. On March 1, 2019, Glencore published on its website its Annual Report for the year ended December 31, 2018 (the "2018 Annual Report"). The Annual Report was signed by Glasenberg and John Burton, the company secretary "on behalf of the Board."

221. The 2018 Annual Report, in Note 33 to the financial statements disclosed for the first time that the settlement with Gécamines was a "gift" or bribe of $1.4 billion plus an additional $248 million just to keep control of its DRC mines. In pertinent part, it states:

**KCC Debt Restructuring**

Kamoto Copper Company ("KCC"), the 75% owned Katanga (in turn 86% held by Glencore) group entity carrying out mining activities in the DRC, had a significant net deficit balance sheet position that was required to be recapitalised under DRC law by 31 December 2017. Notwithstanding the various discussions with KCC's state-owned minority partner, La Générale des Carrières et des Mines ("Gécamines") over the past year, in April 2018, Gécamines commenced legal proceedings in the DRC to dissolve KCC, following KCC's failure to address its capital deficiency.

In June 2018, an agreement was reached with Gécamines to regularise the capital deficiency by converting $5.6 billion of existing intercompany debt owed by KCC to Katanga Mining Limited ("KML") Group (eliminated on consolidation) into equity. ***To ensure Gécamines' 25% interest was not diluted (contractually required), $1.4 billion (25%) of the total debt converted to equity was effectively "gifted" by KML to Gécamines***.

Under IFRS 10, changes in a parent's ownership interest in a subsidiary that do not result in the parent losing control of the subsidiary are equity transactions (i.e. transactions with owners in their capacity as owners) whereby the carrying amounts of the controlling and non-controlling interests are adjusted to reflect the changes in their relative interests in the subsidiary. Any difference between the amount by which the non-controlling interests are adjusted and the fair value of the consideration paid or received is recognised directly in equity and attributed to the owners of the parent. As a result of the debt for equity conversion/transaction, the "gifted" portion of the converted debt resulted in a $1,207 million loss being recognised directly in "other equity reserves", offset by a gain of an equal amount recognised in the "non-controlling interests" equity reserve account.

In addition, it was agreed to:

- Pay Gécamines $150 million to settle various historical commercial disputes;

• Fund, on behalf of Gécamines, $41 million of outstanding unpaid invoices for contractors in charge of an earlier replacement reserves program; and

• Waive KCC's right to $57 million of exploration and drilling expenditures incurred on behalf of Gécamines.

***These amounts, totalling $248 million, have been expensed in the consolidated financial statements***.

222. The above information revealed to the market that the settlement with Gécamines was a "gift" or a bribe to the DRC owned Gécamines that was required if it was going to continue doing business in the DRC. This revealed to the market that Glencore, despite assertions that it was committed to anti-corruption and meeting or "exceeding" laws, was materially false and misleading.

223. The 2018 Annual Report also partially revealed the heightened risk of bribery that Glencore faced, stating for the first time:

> In response to the heightened risks, ***the Board has established a committee that focuses on monitoring ethics and compliance, and seeking to ensure that business practices are aligned with the Company's culture, see page 100***.
>
> * * *
>
> In addition, the Board has established a fifth permanent Committee, the Ethics, Compliance and Culture ("ECC") Committee, which began its work in 2019. The ECC Committee takes responsibility for ethics and compliance in lieu of the audit committee, and will also oversee the Group's culture and related matters.

224. The necessity to create a committee reveals the insufficiency of their prior risk assessment procedures, and the fact that Glencore was not in compliance with money laundering and bribery laws, as well as the FCPA.

225. The 2018 Annual Report also elaborated about the DOJ's investigation. According to the annual report, the DOJ's investigation into Glencore's activities in

Nigeria and Venezuela is focused on agreements to secure oil supplies for its trading arm. In the annual report, Glencore's auditor Deloitte notes the company's activities in Nigeria within this period were "limited primarily to oil offtake agreements." It goes on to say: "Its [Glencore's] activities in Venezuela over the period which is subject to the investigation cover certain oil offtake contracts with the Venezuelan national oil company, Petróleos de Venezuela."

226. It added: "On receipt of the subpoena, the Glencore Board of Directors reconstituted the existing Investigations Committee to assess the implications of the investigation and to oversee the Company's response to the DoJ's investigation."

227. "This Committee has engaged external independent legal counsel in the US to lead the investigation, who has in turn appointed forensic accountants to assist in the investigation."

228. This confirmed that the investigation was focused on the facts specified in the lawsuit filed on March 3, 2018.

229. The above revelations partially revealed that Glencore's previous statements about its ethics and commitment to bribery were false. This partially revealed that Glencore's involvement in bribery and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

230. On this news, shares of GLNCY fell from $8.04 per share at open on March 1, 2019 to a low of $7.93 per share on March 4, 2019, the next trading day, a drop of approximately 1.4%. Similarly, shares of GLCNF fell from $4.07 per share at open on March 1, 2019 to close at $3.97 per share on March 4, 2019, the next trading day, a drop of approximately 2.5%.

231. However, Glencore's stock price would have decline even further, but for its continued misrepresentations that Glencore was committed to meeting or exceeding the laws.

232. For example, the 2018 Annual Report identified certain "mitigating" and "risk" factors relating to bribery and corruption. In pertinent part, the press release stated:

> ***We endeavour to design and execute our projects according to high legal, ethical, social, and human rights standards***, and to ensure that our presence in host countries leaves a positive lasting legacy (see sustainability risks below). This commitment is essential to effectively manage these risks and to maintain our permits and licences to operate.
>
> * * *
>
> **Risk description**
> We are exposed to extensive laws including those relating to bribery and corruption, sanctions, taxation, anti-trust, financial markets regulation, environmental protection, use of hazardous substances, product safety and dangerous goods regulations, development of natural resources, licences over resources, exploration, production and post-closure reclamation, employment of labour and occupational health and safety standards.
>
> * * *
>
> As a diversified sourcing, marketing and distribution company conducting complex transactions globally, ***we are exposed to the risks of fraud, corruption, sanctions breaches and other unlawful activities both internally and externally***. Our marketing operations are large in scale, which may make fraudulent or accidental transactions difficult to detect. In addition, some of our industrial activities are located in countries, where corruption is generally seen. Corruption and sanctions risks remain highly relevant for businesses operating in international markets as shown by recent regulatory enforcement actions both inside and outside the resources sector.
>
> * * *
>
> ***Mitigating factors - We seek to ensure compliance through our commitment to complying with or exceeding the laws and external***

> ***requirements applicable to our operations and products and through monitoring of legislative requirements, engagement with government and regulators, and compliance with the terms of permits and licences***.

233. The above statements were materially false and misleading. While Glencore purported to warn investors of bribery risks, Glencore failed to disclose the fact that it had already engaged in bribery in the DRC, Venezuela, and Nigeria. For example, confidential board minutes show that Gertler personally negotiated mining licenses in favor of Katanga Mining, that Glencore pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in loans and options as a reward. Additionally, Glencore had engaged in bribery schemes in Venezuela and Nigeria in order to gain a market advantage in trading oil off-take agreements.

234. Accordingly, Glencore failed to warn investors that Glencore was subject to heightened scrutiny by U.S. and foreign government bodies.

235. Additionally, Glencore made materially false and misleading statements relating to the risks of making royalty payments to Gertler. In pertinent part the 2018 Annual Report states:

> The year also brought specific challenges for Glencore, commencing in the form of a number of issues at our copper and cobalt operations in the Democratic Republic of Congo (DRC), including those arising from sanctions imposed on Dan Gertler, Katanga's deliberations with Gécamines over the required recapitalisation of its main operating subsidiary (see note 33), a new mining code introduced in 2018 and the recent appearance of excess levels of uranium in the cobalt hydroxide being produced at Katanga.
>
> Katanga resolved the matter with Gécamines in a constructive manner, while ***after careful consideration of its legal and commercial options and obligations to a broad stakeholder universe, Glencore settled its dispute with the various entities affiliated with Dan Gertler, in a***

> ***manner that sought to appropriately address all applicable obligations and concerns.***
>
> * * *
>
> 1) Following the designation by the US Government ("USG") of Dan Gertler and affiliated companies as Specially Designated Nationals (SDNs), thereby imposing blocking sanctions on them and companies owned 50% or more by them, the Group had to consider whether it was able to satisfy contractual obligations to make royalty and pas-de-porte payments in respect of KCC and Mutanda. Following litigation processes and negotiations, ***these obligations are now being satisfied other than in US dollars and without the involvement of US persons, which Glencore believes appropriately addresses all applicable sanctions regulations.***

236. The above statements were materially false and misleading. Glencore gave investors the impression that Glencore was acting in compliance with the US sanctions and foreign anti-corruption laws. However, in reality, Glencore failed to get U.S. approval prior to making the payments to Gertler, putting investors at a heightened risk for sanctions. Further, Glencore had no reasonable basis to believe that it was in compliance with U.S. sanctions and therefore, misled investors as to the heightened risks that Glencore faced due to Glencore's involvement in bribery, and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies for violation of money laundering and bribery laws, as well as the FCPA.

*Glencore 2018 Sustainability Report – April 4, 2019*

237. On April 4, 2019, Glencore published on its website its 2018 Sustainability Report. According to Glencore, the 2018 Sustainability Report "forms part of Glencore's annual corporate reporting suite. It expands on the information provided in [its] Annual Report 2018, detailing how [Glencore] address[es] the most material sustainability risks and opportunities [it] faced during the year." The report is signed by Defendants Glasenberg and Kalmin and states in pertinent part:

> **Transparency of payments**
> ***We remain committed to high standards of corporate governance and transparency and welcome increased transparency around the redistribution and reinvestment of our payments to government.*** We have been an active supporter in the Extractive Industries Transparency Initiative since 2011.
>
> * * *
>
> **Payments to governments**
> We pay all relevant taxes, royalties and levies required by local and national regulation in our host countries. The payments we make to the governments of the countries in which we operate include local, national, sales and employment taxes, government royalties and licence and permitting fees. In addition, we contribute to local economies through our use of local suppliers, wages and employee benefits, voluntary support of socio-economic initiatives such as health and education projects and infrastructure development.

238. The above statements were materially false and misleading. While Glencore purported to be "committed to high standards of corporate governance and transparency," Glencore hid the fact that it was engaged in bribery in the DRC, Venezuela, and Nigeria. For example, confidential board minutes show that Gertler personally negotiated mining licenses in favor of Katanga Mining, that Glencore pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in loans and options as a reward. Additionally, Glencore was engaged in bribery schemes in Venezuela and Nigeria in order to gain a market advantage in trading oil off-take agreements.

239. This bribery resulted in a heightened risk to Glencore shareholders. Accordingly, Glencore failed to warn investors that Glencore was subject to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

*<u>Glencore Press Release – April 25, 2019</u>*

240. On April 25, 2019, Glencore published on its website a press release titled, "Announcement re the Commodity Futures Trading Commission." The press release stated in pertinent part:

> Glencore has been informed by the United States Commodity Futures Trading Commission ("CFTC") that the CFTC is investigating whether ***Glencore and its subsidiaries may have violated certain provisions of the Commodity Exchange Act and/or CFTC Regulations through corrupt practices in connection with commodities.***
>
> Glencore understands that the CFTC's investigations are at an early stage and ***have a similar scope in terms of subject matter as the current ongoing investigation by the US Department of Justice ("DOJ")***.
>
> Glencore will cooperate with the CFTC. Glencore's response will be managed by its Investigations Committee, which was set up in July 2018 to oversee Glencore's response to the investigation by the DOJ.

241. This partially revealed to the market that Glencore's previously statements regarding compliance and commitments to ethics were materially false and misleading. In realty, Glencore's conduct relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

242. Additionally, this also revealed to investors that despite Glencore's statements it was in compliance with U.S. sanctions, in reality, Glencore had no reasonable basis to believe that its payments to Gertler complied with the U.S. imposed sanctions.

243. On this news, shares of GLNCY fell from $8.57 per share at close on April 24, 2019, to a low of $7.96 per share on April 26, 2019, a drop of over 7%. Similarly, shares of GLCNF fell from $4.35 per share at close on April 24, 2019, to a low of $3.97 per share on April 26, 2019, a drop of approximately 8.7%.

*Glencore Press Release – December 5, 2019*

244. On December 5, 2019 pre-market trading hours, Glencore published on its website a press release titled, "Investigation by the Serious Fraud Office." The press release stated in pertinent part:

> Investigation by the Serious Fraud Office
>
> **NEWS RELEASE**
> **Baar, 5 December 2019**
> Glencore has been notified today that the Serious Fraud Office (SFO) has opened an investigation into suspicions of bribery in the conduct of business of the Glencore group.
>
> Glencore will co-operate with the SFO investigation.

245. Shortly after Glencore's announcement, the UK's SFO stated, "Following the announcement by Glencore PLC, the SFO confirms it is investigating ***suspicions of bribery in the conduct of business by the Glencore group of companies, its officials, employees, agents and associated persons***."

246. The market immediately reacted to this news. RBC Capital Markets analyst Tyler Broda said: "This is an obvious negative for the Glencore investment case and adds to the complications of the ongoing US Department of Justice and CFTC investigations around activities in DRC, Venezuela and Nigeria.

247. "The scope of the SFO investigation, albeit with limited detail, appears to be wider (NB the DOJ also has criminal investigative powers) and potentially increases the overall penalty should Glencore be eventually found guilty or reach a settlement. This said, peer Rio Tinto has also been under an SFO investigation surrounding activities in Guinea since 24 July 2017 so this is not unprecedented occurrence. However we believe this clearly will hamper sentiment in what remains a complex investment case for investors."

248. This revealed to the market that Glencore's continued association with Gertler, and similar acts of bribery in Nigeria and Venezuela would result in significant costs to shareholders and was not an isolated event to US sanctions, but in reality, a company-wide scheme of repeated acts of bribery and violations of foreign corruption laws. This also revealed to the market that Glencore's previously statements regarding compliance and commitments to ethics were materially false and misleading. In realty, Glencore's conduct relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA.

249. Additionally, this also revealed to investors that despite their statements it was in compliance with U.S. sanctions, in reality, Glencore had no reasonable basis to believe that its payments to Gertler complied with the U.S. imposed sanctions.

250. On this news, shares of GLNCY fell from $6.19 per share at close on December 4, 2019 to close at $5.69 per share on December 5, 2019, a drop of over 8%. Similarly, shares of GLCNF fell from $3.14 per share at close on December 4, 2019 to close at $2.87 per share on December 5, 2019, a drop of over 8.5%.

**G. Defendants Acted with Scienter.**

251. Each of the Defendants at various times throughout the Class Period made statements which materially misled Plaintiffs and other Glencore investors. While Defendants presented the public with statements and information tending to suggest that Glencore operated in strict compliance with anti-bribery and anti-corruption laws (including but not limited to the FCPA), Glencore had in fact already been engaged in bribery schemes in the DRC, Venezuela, and Nigeria. Furthermore, Defendants represented their compliance and commitment to ethics as one of Glencore's strengths and mitigating factors. In reality, Glencore put profits and

assets over compliance with foreign laws. Finally, Defendants failed to disclose that Glencore's involvement in bribery and payments and association with Gertler would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA. Defendants made these statements with scienter given the fact that they knew, or consciously disregarded with extreme recklessness, the truth about Glencore's illegal conduct in the DRC, Venezuela, and Nigeria.

252. Below are additional facts that show that Defendants acted with actual knowledge or deliberate recklessness when misleading investors.

*Defendants had Actual Knowledge of the Bribery Schemes or were Deliberately Reckless in not Knowing*

253. Defendants knew or were deliberately reckless in not knowing that Glencore's risk disclosures were inadequate and that it issued false and misleading statements relating to its corporate governance, ethics, and integrity. This is evident because Glencore was engaged in a widespread bribery scheme in the DRC, Venezuela, and Nigeria.

254. In the DRC, Glencore and Defendant Glasenberg had actual knowledge of the bribery payments made by Gertler to Kabila on Glencore's behalf. This is shown because Glencore was Gertler's biggest partner, and Gertler says he managed his relationship with Glencore directly with Defendant Glasenberg. Between 2007 and 2017, the pair participated in more than a dozen transactions involving Congolese assets that turned Glencore into the world's third-largest copper producer and largest producer of cobalt. Glencore also helped Gertler accumulate more than $2 billion in wealth.

255. Further, Glencore's confidential board minutes, show that Gertler personally negotiated mining licenses in favor of Katanga Mining, that Glencore

pushed for Gertler to take on this role, and that Glencore provided Gertler with tens of millions of dollars in loans and options as a reward.

256. In Venezuela, Defendants' knowledge or deliberate recklessness is shown because of the severity and duration of the bribery payments. Glencore made ***monthly*** bribery payments to gain an economic advantage in Venezuela. Glencore was a member of the fictitious "agency" and "advisory" agreements, and had direct access to the clone server and the PDVSA Commercial and Supply Department. Additionally, emails evidencing the bribery were sent to Glencore domain email addresses.

257. Therefore, Glencore was aware of the bribery payments being made to obtain economic advantages, or were deliberately reckless in not knowing of the bribes. Accordingly, the false and misleading statements that omitted the heightened risk of Glencore's involvement with bribery were made with actual knowledge or were made with deliberate recklessness of the truth.

*Defendants knew that Associating with Gertler was Risky*

258. Defendants also knew that they were making materially false and misleading statements relating to the risks involved with associating with and making payments to Gertler, and their basis for their "belief" that they complied with U.S. sanctions.

259. By 2009, Gertler's was well known as a controversial figure in the DRC, yet Glencore and Glasenberg decided to do business with Gertler regardless.

260. Additionally, Glencore's decision to buy Gertler out to distance itself from Gertler in 2017 shows that Glencore knew the risks of doing business with Gertler.

261. Further, Defendants knew or were deliberately reckless in not knowing that the continued payments to Gertler, without U.S. approval, would lead to increased changes of investigations and sanctions. This is evident because Glencore

initially decided not to make the payments to Gertler because doing so would be in violation of the U.S. sanctions. When the market found out that Glencore was making the payments regardless of the sanctions, it was shocked, calling the move unprecedented.

262. Further, Glencore's subsidiary ***admitted*** that it failed to disclose material risks to its business, which Glencore also failed to disclose specifically: "the elevated risk of public sector corruption in the Democratic Republic of the Congo (DRC) and the nature and extent of Katanga's reliance on individuals and entities associated with Dan Gertler. Gertler's close relationship with Joseph Kabila, the President of the DRC, and allegations of Gertler's possible involvement in corrupt activities in the DRC were referred to in media and non-governmental reports."

263. Therefore, Glencore knew of Gertler's corrupt involvement in the DRC and elevated risks associated with making payments to Gertler.

264. Accordingly, Defendants knew or were deliberately reckless in failing to adequately warn investors of the risks of associating with Gertler.

*The Departure of Directors*

265. On December 18, 2018, Glencore announced that Katanga had come to a settlement agreement with the OSC.

266. The departure of key executives from the board of Glencore's DRC subsidiary Katanga Mining after the OSC opened an investigation into accounting irregularities at the company is also indicative of scienter.

267. As a result of the OSC investigation, Aristotelis Mistakidis, one of Glencore's most senior executives and two other Glencore executives, Liam Gallagher and Tim Henderson stepped down from the board in November 2017 after Glencore and Katanga Mining confirmed the investigation. Additionally, as part of the Settlement with the OSC, director and CEO Johnny Blizzard was forced to step down as CEO of Katanga Mining.

268. According to the Financial Times, Mistakidis' "departure comes despite Mr[.] Glasenberg's reputation for shielding the inner core of key executives at the company, who all report into Mr[.] Glasenberg daily. They include Daniel Mate, Tor Peterson, Alex Beard, the respective heads of zinc, coal and oil trading." The article also states that "[o]ne mining analyst who has known Mr[.] Mistakidis for years said the executive seemed to be 'the sacrificial lamb'. He added the departure appeared to be 'connected with the [investigations] and trying to draw a line under the past.'"

269. Additional executives of Katanga Mining were also found to do wrong-doing by the OSC including former chief financial officers Jacques Lubbe and Matthew Colwill, former director and chief executive officer (CEO) Jeffrey Best.

270. Each of Mistakidis, Lubbe and Best were prohibited from becoming or acting as an officer or director of a reporting issuer for four years. Gallagher was prohibited from becoming or acting as an officer or director of a reporting issuer for six years. Henderson was prohibited from becoming or acting as an officer or director of a reporting issuer for three years. Each of Colwill and Blizzard were prohibited from becoming or acting as an officer or director of a reporting issuer for two years.

271. These resignations and penalties show that Defendants knew or were deliberately reckless in not knowing of the risks associated with Gertler.

*Glencore Intentionally Orchestrated the Bribery Schemes and Illegal Payments to Gertler to Maximize Profits*

272. Glencore's motive is also indicative of scienter. Glencore was also motivated to make the false and misleading statements. For example, if Glencore were to stop making payments to Gertler they would risk losing their assets in the DRC. Glencore called the payments to Gertler "the only viable option to avoid the material risk of seizure" of its Mutanda Mining and KCC assets in the DRC. This

was a substantial factor in determining whether to mislead investors about payments to Gertler. For example, Bloomberg reported that Glencore made this decision "without public approval from U.S. authorities, as part of an effort to keep access to valuable mining assets."

273. A spokesman said Glencore discussed the matter with U.S. and Swiss authorities, but declined to confirm whether the U.S. would pursue secondary sanctions. According to Elisabeth Caesens, a DRC expert and director of Brussels-based Resource Matters Glencore, "Glencore seems more afraid of Gertler's striking power in Congo's courts than of U.S. sanctions". "Time will tell if this is the right bet, it's arguably not the most ethical one," she said.

274. This shows that Defendants knew that there was a heightened risk that they were subject to sanctions but assured investors that they were in compliance with the U.S. sanctions regardless. Defendants either knew these statements were false, or had no reasonable basis to make these statements.

275. Accordingly, Defendants acted with actual knowledge or deliberate recklessness when it told investors that it believed it was in compliance with U.S. sanctions.

*The DRC was an integral part of Glencore's operations*

276. The DRC was such an important and integral part of Glencore's operations that it would be absurd to suggest that Defendants were unaware of the bribes that Glencore made.

277. Glencore owns 86% Katanga Mining that it claims to have the "potential of becoming Africa's largest copper producer and the world's largest cobalt producer." Additionally, the Mutanda Mining operation is a significant source of cobalt supply and provides approximately 20% of the world's cobalt supply. Cobalt is used in electric car batteries and in cell phones.

278. Cobalt is considered a critical raw material and technology enabler, where its used in gas turbines, high temperature alloys, industrial catalysts and energy storage. Cobalt is a key ingredient in the battery chemistry expected to help transition to a low-carbon economy. Cobalt is only found in economically exploitable quantities in just a few countries, including those in Central Africa. Around 49% of the world's reserves are found in the DRC which is also responsible for close to 60% of annual mine supply.

279. Given its broad range of applications, cobalt is expected to experience good demand growth in its traditional markets going forward whilst battery sector demand is likely to rise at double-digit rates, leading to strong and sustained consumption growth.

280. In 2017, copper assets, including cobalt, represented $17,218,000,000 in revenue, approximately 58% of Glencore's total metals and minerals revenue.

281. In 2018, copper assets, including cobalt, represented $18,200,000,000 in revenue, approximately 59% of Glencore's total metals and minerals revenue.

282. Accordingly, the mines in the DRC represented an integral part of Glencore's current and future operations due to the high demand of cobalt.

283. Defendants acted with scienter when making statements regarding Glencore's commitment to ethics and anti-bribery practices. Given the severeness of the scheme and effect on profits, it is highly implausible that Glencore's senior executives did not know or, in the absence of deliberate recklessness, would not have been aware of them.

*Corporate Scienter*

284. Glencore's propensity to engage in bribery and corruption is evidence that Glencore is routinely directed by high-level employees, if not Defendants themselves, to violate the law.

285. On July 11, 2018, Glencore established a new Board Committee to oversee the DOJ subpoena. This committee was comprised of Glencore Board Chairman, Tony Hayward, Leonhard Fischer (Independent Non-Executive Director) and Patrice Merrin (Independent Non-Executive Director). Leonhard Fischer attended all meetings of the Audit Committee in 2017 and 2018, and Patice Merrin attended a meeting of the Audit Committee in 2018. The Audit Committee was responsible for overseeing the Glencore's business ethics committee. Defendant Kalmin was also responsible for attending all meetings of the Audit Committee.

286. After July 11, 2018, Defendants continued to make material misrepresentations about Glencore's risks and investigations. The fact that Glencore had a committee looking into the allegations alleged by the DOJ show that they knew at this time that the disseminated statements were materially false and misleading. Additionally, as members of the Board, this shows that Defendants also knew that these statements were materially false and misleading.

287. Therefore, Glencore engaged in this course of action due to direction from high-level employees at the company. The employees that directed Glencore to engage in wrongful conduct did so with scienter and, as a result, their scienter is imputed to Glencore.

288. The scienter of the Individual Defendants is imputed to Glencore under the doctrine of respondeat superior and common law principles of agency.

* * *

289. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of Glencore or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such

statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Glencore, their control over and/or receipt and/or modification of Glencore's allegedly materially misleading misstatements and/or their associations with Glencore which made them privy to confidential proprietary information concerning Glencore, were active and culpable participants in the fraudulent scheme alleged herein.

290. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of Glencore, including each of the Defendants.

291. Defendants, because of their positions with Glencore, controlled the contents of the Glencore's public statements during the Class Period. Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Glencore's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

## H. Loss Causation and Economic Harm.

292. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Glencore's securities in response to

company specific news about Glencore practices, Plaintiffs and the other Class members have suffered significant damages.

293. During the Class Period, Defendants concealed from Plaintiffs and other Class members that Glencore faced increased regulatory risk and exposure that would arise from Glencore's illegal bribes, payments, and conduct. To the extent that information came into the market suggesting that Glencore may have been engaged in such improper practices, Defendants continually denied that Glencore had engaged in any such practices and insisted that Glencore's practices was appropriate at all times. This, in turn, artificially inflated the price of Glencore securities and operated as a fraud or deceit on purchasers of Glencore securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market as evidence of Glencore's scheme emerged, the price of Glencore securities materially declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Glencore securities during the Class Period, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages under federal securities laws.

294. The truth was initially partially revealed on July 27, 2017, when the Wall Street Journal reported that Glencore was subject to an investigation by the OSC for over $100 million in royalty payments made by Katanga Mining to Gertler. This partially revealed that Glencore's prior statements about its commitments to ethics and anti-corruption were materially false and misleading and that Glencore had omitted significant risks related to heightened scrutiny by U.S. and foreign government bodies as a result of its association with Gertler and payments being made to Gertler. This caused Glencore securities to significantly decline.

295. On this news, shares of GLNCY fell from an open of $8.68 per share on July 27, 2017, to a low of $8.52 per share on July 27, 2017, a drop of over 1.8%.

Similarly, shares of GLCNF fell from an open of $4.35 per share on July 27, 2017, to close at $4.29 per share on July 27, 2017, a drop of over 1.3%.

296. Similarly, on November 20, 2017, Glencore confirmed that the OSC was investigating Katanga Mining, and partially revealed that Glencore's prior statements about its commitment to ethics and integrity were materially false and misleading. This showed that Glencore and its subsidiaries were subject to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA. This caused Glencore securities to significantly decline.

297. On this news, shares of GLNCY fell from a high of $9.49 per share on November 20, 2017, to a low of $9.35 per share on November 20, 2017, a drop of over 1.4%. Similarly, shares of GLCNF fell from a high of $4.78 per share on November 20, 2017, to a low of $4.70 per share on November 20, 2017, a drop of over 1.6%.

298. On March 2, 2018, Glencore revealed in its 2017 Annual Report that Glencore had made royalty payments to Gertler instead of Gécamines, and the heightened risks associated with making payments to Gertler. This information showed that Glencore's prior risk disclosures were deficient, and Glencore's statements relating to its commitment to ethics were materially false and misleading. This caused Glencore securities to significantly decline.

299. On this news, shares of GLNCY fell from a close of $10.27 per share on March 1, 2018, to a low of $9.99 per share on March 2, 2018, a drop of over 2.7%. Similarly, shares of GLCNF fell from a close of $5.20 per share on March 1, 2018, to a low of $5.02 per share on March 2, 2018, a drop of over 3.4%.

300. Further, on March 3, 2018, when the PDVSA US Litigation Trust filed suit against Glencore, among others, for engaging in a bribery scheme in Venezuela. The pertinent facts of the lawsuit are detailed above. The lawsuit detailed Glencore's

bribery scheme in Venezuela and disclosed to investors that Glencore did not prioritize ethics and compliance, but in fact routinely made bribes in Venezuela to win contracts. This also partially revealed to investors that Glencore's involvement in bribery in Venezuela would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA. This caused Glencore securities to significantly decline.

301. On this news, shares of GLNCY fell from a close of $10.17 per share on March 2, 2018, to a low of $9.92 per share on March 5, 2018 (the next trading day), a drop of approximately 2.5%. Similarly, shares of GLCNF fell from a close of $5.10 per share on March 2, 2018, to a low of $4.96 per share on March 5, 2018 (the next trading day), a drop of approximately 2.8%.

302. Additionally, on April 27, 2018, Glencore issued a press release announcing that Gertler had filed suit against Glencore for failure to make royalty payments and that a court in the DRC had frozen a number of Glencore's assets in the DRC. This revealed to the market that Glencore's prior risk disclosures were deficient because Glencore was under heightened risks due to its relationship and business dealings with Gertler. This caused Glencore securities to significantly decline.

303. On this news, shares of GLNCY fell from a close of $10.25 per share on April 26, 2018, to open at $9.65 per share on April 30, 2018 (the next trading day), a drop of approximately 5.9%. Similarly, shares of GLCNF fell from a close of $5.18 per share on April 26, 2018, to open at $4.88 per share on April 30, 2018 (the next trading day), a drop of approximately 5.8%.

304. On May 18, 2018, Bloomberg reported that the U.K.'s Serious Fraud Office was preparing to open a formal bribery investigation into Glencore. This again partially revealed to the market that Glencore's prior risk disclosures were

deficient because Glencore's conduct relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign government bodies, and showed that Glencore's previous statements about its corporate governance and commitment to ethics were false. This caused Glencore securities to significantly decline.

305. On this news, shares of GLNCY fell $0.55 per share, or over 5%, to close at $10.13 per share on May 18, 2018, while shares of GLCNF fell $0.32 per share, or nearly 6%, to close at $5.06 per share on May 18, 2018.

306. On June 15, 2018, Glencore published a press release referring investors to Katanga Mining's press release providing an update on its April 27, 2018 announcement in respect of freezing orders filed against KCC, by Ventora. This revealed that Glencore's previous statements that it was "committed to complying with or exceeding the laws" in order to assure investors of corporate governance were materially false and that Glencore's risk disclosures were inadequate. In realty, Glencore's association and payments relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA. This caused Glencore securities to significantly decline.

307. On this news, shares of GLNCY fell from $10.54 per share at close on June 14, 2018 to open at $9.91 per share on June 18, 2018 (the first trading day after June 15, 2018), a drop of approximately 6%. Similarly, shares of GLCNF fell from $5.28 per share at close on June 14, 2018 to open at $5.02 per share on June 18, 2018 (the first trading day after June 15, 2018), a drop of approximately 5%.

308. On July 3, 2018, Glencore announced that the DOJ had it a subpoena to produce documents and other records in connection with its compliance with U.S. money laundering statutes and the FCPA. This revealed to the market that Glencore's statements relating to ethics, integrity, and anti-corruption were

materially false, and that Glencore's prior risk disclosures were materially deficient. This caused Glencore securities to significantly decline.

309. On this news, shares of GLNCY fell $0.86 per share, or over 9%, to close at $8.31 per share on July 3, 2018, while shares of GLCNF fell $0.41 per share, or nearly 9%, to close at $4.20 per share on July 3, 2018.

310. On July 11, 2018 Glencore revealed the severity of the DOJ investigation announcing a special committee to oversee the DOJ investigation. This revealed Defendants fraud because it disclosed the severe risks that Glencore encountered by making bribes in the DRC, Venezuela, and Nigeria, and revealed that Glencore's conduct relating to Gertler and bribery subjected Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA, and showed that Glencore's previous statements about its corporate governance were inadequate. This caused Glencore securities to significantly decline.

311. On this news, shares of GLNCY fell from $8.63 per share at close on July 10, 2018, to a close of $8.10 on July 11, 2018, a drop of over 6%. Similarly, GLCNF fell from $4.32 per share at close on July 10, 2018, to a close of $4.07 on July 11, 2018, a drop of nearly 6%.

312. On December 18, 2018, Glencore announced that Katanga Mining admitted that it failed to adequately warn investors of its association with Gertler. This revealed that Defendants' previous statements relating to its risks disclosures were materially inadequate and that Glencore's statements regarding its corporate governance, ethics, and integrity were materially false. This caused Glencore's securities to decline and harm investors.

313. On this news, shares of GLNCY fell from a high of $7.47 per share at open on December 18, 2018 to a low of $7.18 per share on December 18, 2018, a

drop of approximately 3.9%. Similarly, shares of GLCNF fell from $3.67 per share at open on December 18, 2018, to close at $3.60 per share on December 18, 2018, a drop of approximately 1.9%.

314. On March 1, 2019, Glencore revealed that its settlement with Gécamines was a "gift" or a bribe to the DRC owned Gécamines that was required if it was going to continue doing business in the DRC. It also revealed that it needed to create a new committee to oversee ethics at Glencore. Finally, Glencore revealed that the investigations in Nigeria were related to the same conduct detailed in the lawsuit filed against Glencore for bribery in Venezuela. These revelations partially revealed that Glencore's previous statements about its ethics and commitment to bribery were false. This partially revealed that Glencore's involvement in bribery and payments and association with Gertler that would subject Glencore to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Glencore's compliance with money laundering and bribery laws, as well as the FCPA. This caused Glencore securities to drop significantly.

315. On this news, shares of GLNCY fell from $8.04 per share at open on March 1, 2019 to a low of $7.93 per share on March 4, 2019, the next trading day, a drop of approximately 1.4%. Similarly, shares of GLCNF fell from $4.07 per share at open on March 1, 2019 to close at $3.97 per share on March 4, 2019, the next trading day, a drop of approximately 2.5%.

316. On April 25, 2019, Glencore announced the CFTC investigation relating to bribery in the DRC, Venezuela, and Nigeria. This revelation, that Glencore was subject to heightened risk due to Glencore's engagement in bribery and illegal payments to Gertler, revealed that Glencore's previous statements that it was in compliance with U.S. sanctions, and that it was committed to ethics and exceeding foreign laws were materially false. This caused Glencore securities to significantly decline.

317. On this news, shares of GLNCY fell from $8.57 per share at close on April 24, 2019, to a low of $7.96 per share on April 26, 2019, a drop of over 7%. Similarly, shares of GLCNF fell from $4.35 per share at close on April 24, 2019, to a low of $3.97 per share on April 26, 2019, a drop of approximately 8.7%.

318. On December 5, 2019 Glencore announced the investigation by the SFO. This revealed to the market that Glencore's previous risk warnings about bribery were materially deficient. It also disclosed to the market that Glencore engaged in a company-wide scheme of repeated acts of bribery and violations of foreign corruption laws, despite its previous assertion of its commitment to ethics and exceeding relevant laws. These revelations caused Glencore securities to significantly decline.

319. On this news, shares of GLNCY fell from $6.19 per share at close on December 4, 2019 to close at $5.69 per share on December 5, 2019, a drop of over 8%. Similarly, shares of GLCNF fell from $3.14 per share at close on December 4, 2019 to close at $2.87 per share on December 5, 2019, a drop of over 8.5%.

320. The declines in Glencore securities was caused by the revelation to the market about the true state of Glencore's corporate governance and business operations, including its commitment to following foreign anti-corruption laws. These truths revealed that Defendants had concealed from the public that Glencore was subject to a heightened risk of regulatory exposure as a result of illegal bribery practice. As investors fully understood the risk profile and true nature of Glencore's business practices (which Defendants had repeatedly and aggressively previously attempted to conceal), the price of Glencore's securities severely declined harming investors. This resulted in damages to Glencore securities investors.

321. Overall, from before the first partial disclosure on March 3, 2018, until the final disclosure on December 5, 2019, the Glencore securities fell from a close of $10.17 per share (GLNCY) and $5.10 per share (GLCNF) on March 2, 2018, to

close at $5.69 per share (GLNCY) and $2.87 per share (GLCNF) on December 5, 2019, a drop of over 44% and 43%, respectfully.

322. The decline in the price of Glencore securities caused economic harm to Plaintiffs and other Class members as the value of their investments declined due to the fraud alleged herein.

**I. Presumption of Reliance; Fraud-On-The-Market.**

323. At all relevant times, the market for Glencore securities was an efficient market for the following reasons, among others:

a. Glencore securities met the requirements for listing, and were listed and actively traded on the OTC Market, a highly efficient;

b. During the Class Period, Glencore securities were actively traded, demonstrating a strong presumption of an efficient market;

c. Glencore regularly communicated with public investors via established market communication mechanisms;

d. Glencore was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

e. Unexpected material news about Glencore securities was rapidly reflected in and incorporated into Glencore's securities' prices during the Class Period.

324. As a result of the foregoing, the market for Glencore securities promptly digested current information regarding Glencore from all publicly available sources and reflected such information in Glencore's stock price. Under these circumstances, all purchasers of Glencore securities during the Class Period

suffered similar injury through their purchase of Glencore securities at artificially inflated prices, and a presumption of reliance applies.

325. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**J. No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine.**

326. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

327. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

328. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, even if they were identified as "forward-looking statements," which they were not, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Glencore who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such

assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

329. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Glencore securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of Glencore, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

330. The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Glencore securities were actively traded on the OTC Market. There are over 14.5 billion ordinary shares of Glencore. During the Class Period, daily average trading volume in in GLNCY and GLCNF was 264,036 shares/day and 74,070 shares/day respectfully. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by the market-makers or transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

331. Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

332. Plaintiffs have and will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

333. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the risk disclosures, business, operations, practices, policies and management of Glencore;

c. whether Defendants acted knowingly or were deliberately reckless in issuing false and misleading statements;

d. whether the prices of Glencore securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

e. whether the Class members have sustained damages and, if so, what is the proper measure of damages.

334. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Against Defendants for Violations of Section 10(b) and Rule 10b-5**

335. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

336. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

337. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; and (ii) cause Plaintiffs and the other Class members to purchase Glencore securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

338. As a result of the dissemination of the false and misleading information and failure to disclose material facts, as set forth above, the market price of Glencore securities were artificially inflated throughout the Class Period. In ignorance of the fact that market prices of Glencore securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements during the Class Period, Plaintiffs and the other Class members acquired Glencore securities during the Class period at artificially inflated prices and were damaged thereby.

339. This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of securities giving rise to the cause of action.

**COUNT II**

**Against the Individual Defendants for Violations of Section 20(a)**

340. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

341. During the Class Period, the Individual Defendants participated in the operation and management of Glencore, and conducted and participated, directly and indirectly, in the conduct of Glencore's business affairs. Because of their senior positions, they knew the adverse non-public information about Glencore's misstatements as set forth above.

342. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Glencore's risks and illegal payments, and to correct promptly any public statements issued by Glencore which had become materially false or misleading.

343. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Glencore disseminated in the marketplace during the Class Period concerning Glencore's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Glencore to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Glencore within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Glencore securities.

344. Each of the Individual Defendants, therefore, acted as a controlling person of Glencore. By reason of their senior management positions and/or being directors of Glencore, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Glencore to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised

control over the general operations of Glencore and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Class members complain.

345. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Glencore.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

a. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative and their counsel as Class Counsel;

b. Requiring Defendants to pay damages sustained by Plaintiffs and the other Class members by reason of the acts and transactions alleged herein;

c. Awarding Plaintiffs and the other Class members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

d. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: January 7, 2019

**LEVI & KORSINSKY, LLP**

s/ Eduard Korsinsky
Eduard Korsinsky (EK-8989)
55 Broadway, 10th Floor

New York, New York 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: ek@zlk.com

-and-

Nicholas I. Porritt
Adam M. Apton
Adam C. McCall
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
Email: amccall@zlk.com

*Attorneys for Plaintiffs and Lead Counsel for the Class*